The Honorable Benjamin H. Settle

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| FUEL MEDICAL GROUP, LLC, a Washington limited liability company, | Case No. 3:22-cv-05934-BHS |
| Plaintiff, | |
| v. | |
| SONOVA USA INC., a Minnesota corporation, | |
| Defendant. | |
| SONOVA USA INC., a Minnesota corporation, | Consolidated Case No. 3:23-cv-05544 |
| Plaintiff, | SONOVA USA INC.'S FIRST AMENDED COMPLAINT |
| v. | |
| FUEL MEDICAL GROUP, LLC, a Washington limited liability company, | |
| Defendant. | |

Plaintiff Sonova USA Inc. ("Sonova"), by and through its counsel, Taft Stettinius & Hollister LLP and Miller Nash LLP, and for its First Amended Complaint against Defendant Fuel Medical Group LLC ("Fuel"), states as follows:

SONOVA USA INC.'S FIRST AMENDED COMPLAINT - 1
(Case Nos. 3:23-cv-05544 & 3:22-cv-05934-BHS)

4877-5698-3939.2

**MILLER NASH LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
605 5TH AVE S, STE 900
SEATTLE, WASHINGTON 98104

1.     This is an action for fraud based on misrepresentations Fuel repeatedly made to Sonova during the course of their five and a half year contractual relationship. Specifically, Fuel intentionally convinced Sonova that Fuel was an independent buying group, not owned by any of Sonova's competitors. As a result of Fuel's misrepresentations, Sonova agreed to pay Fuel highly lucrative rebates on sales to Fuel's network members. Sonova also agreed to make other generous payments to Fuel and its network members, such as for promotional events and marketing consulting.

2.     Sonova is a global leader in the manufacturing of hearing care instruments that it sells and distributes to a wide range of customers including physicians, private practice audiology centers, managed care organizations, and other hearing instrument resellers. Fuel is a buying group that enlists audiology and ear-nose-throat ("ENT") practices to participate in its member network and, thereby, take advantage of competitive pricing on hearing instruments. Sonova's predecessor and Fuel began a business relationship in 2010. Under the relationship, Sonova sold products directly to members of Fuel's buying network at advantageous prices that Fuel negotiated and established with Sonova. Each month, Sonova would, in turn, pay Fuel rebates based upon those sales. These rebates were often more than 30 percent of the sale prices.

3.     Sonova's willingness to pay Fuel such lucrative rebates and to fund other expenses for Fuel was based on Sonova's false belief that Fuel, as a buying group independent from all Sonova's competitors, had no bias toward any specific manufacturer. Indeed, Fuel had engaged in discussions with Sonova about a sale of Fuel's business at some point in the future. By contrast, while Sonova does sell its products through buying groups that it knows to be owned by other hearing instrument manufacturers, it does so on substantially less lucrative terms than were provided to Fuel.

4.     In truth, however, Fuel was, and is, partially owned by one of Sonova's largest competitors, Oticon, Inc. ("Oticon")—a fact Fuel repeatedly hid from Sonova and from the hearing

**MILLER NASH LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
605 5TH AVE S, STE 900
SEATTLE, WASHINGTON 98104

instrument market in general. Indeed, Fuel often touts to audiologists and ENT groups that are potential members of its buying network that it is independent of any of the manufacturers. Ironically, Sonova only learned of Fuel's deception as to Oticon's ownership after Fuel removed this very lawsuit—originally filed in state court as a single count for declaratory judgment in response to Fuel's demand for $12 million—to federal court in Illinois. Even then, Fuel attempted to shroud Oticon's ownership stake in it, filing incomplete jurisdictional statements and ignoring the citizenship disclosure requirements of the local rules. Fuel only came clean and divulged Oticon's ownership when faced with imminent remand to the state court.

5.      Sonova also continues to request declaratory judgment, in light of Fuel's continued claim that Sonova somehow acted inappropriately when, and after, it allowed the parties' contractual relationship to expire of its own terms. On November 29, 2022, after Sonova filed this action in Illinois state court, Fuel filed a complaint in this Court. This Court, through Judge Settle, dismissed Fuel's complaint. It dismissed several of Fuel's claims with prejudice, but granted Fuel leave to attempt to replead some of its claims.

## **THE PARTIES**

6.      Sonova is a Minnesota corporation with its principal place of business located in Illinois. Sonova conducts business in the state of Washington.

7.      Fuel is a Washington limited liability company, with its principal place of business in Camas, Washington. Its members are Brendan Ford and Shawn Parker, both of whom are Washington citizens, and—of course, as Sonova recently learned—Oticon. Oticon is a California corporation with its principal place of business located in New Jersey. Fuel conducts business in the state of Washington.

**MILLER NASH LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
605 5TH AVE S, STE 900
SEATTLE, WASHINGTON 98104

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332. Fuel is a citizen of Washington, California, and New Jersey because it is a limited liability company and its members are citizens in those states. Sonova is a citizen of Minnesota and Illinois because it is a Minnesota corporation with its principal place of business in Illinois. The amount in controversy exceeds $75,000 exclusive of interest and/or costs.

9.      The Court has personal jurisdiction over the dispute and controversies alleged herein because Fuel and Sonova consented to such jurisdiction in their 2017 Supply Agreement and because a substantial portion of the facts giving rise to this action occurred in Washington.

10.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial portion of the facts giving rise to this action occurred in the Western District of Washington.

## FACTUAL ALLEGATIONS

11.     The relationship between Sonova and Fuel began on August 23, 2010, when Fuel entered a supply agreement with Phonak, LLC ("Phonak"), which later became Sonova.

12.     On or about March 1, 2017, Phonak and its sister company, Unitron Hearing, Inc. ("Unitron"), entered a new supply agreement with Fuel (the "Supply Agreement" or the "Agreement"). A true and accurate copy of the Supply Agreement is attached hereto as Exhibit A.

13.     On or about April 23, 2020, Fuel and Sonova executed an amendment to the Supply Agreement (the "First Amendment"), which provided that Sonova was the successor-in-interest to Phonak and that Unitron merged into Sonova. Accordingly, Sonova became a party to the Supply Agreement. A true and accurate copy of the First Amendment is attached hereto as Exhibit B.

14.     On January 2, 2018, Fuel and Sonova entered into a non-disclosure agreement ("NDA"), which essentially reiterated the confidentiality provisions of the Supply Agreement. A true and accurate copy of the NDA is attached hereto as Exhibit C. In its demand letter and now-

SONOVA USA INC.'S FIRST AMENDED COMPLAINT - 4
(Case Nos. 3:23-cv-05544 & 3:22-cv-05934-BHS)

4877-5698-3939.2

**MILLER NASH LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
605 5TH AVE S, STE 900
SEATTLE, WASHINGTON 98104

dismissed complaint, Fuel contended Sonova violated the NDA by supposedly using Fuel's confidential information.

15. As noted above, the parties agreed in Section 7.06 of the Supply Agreement to submit to the jurisdiction of the United States District Court for the Western District of Washington for any action or proceeding arising thereunder.

## I. The Supply Agreement

16. Under the terms of the Supply Agreement, Fuel agreed to allow Sonova to sell its hearing instruments directly to Fuel's network of members, and, in exchange, Sonova agreed to pay certain "Revenue Sharing Payments" to Fuel based on a percentage of those sales. Sonova, thus, sold hearing instruments directly to customers and invoiced the customers for those sales, including customers that were in Fuel's network of members. Fuel also agreed to market and promote Sonova's products in the ENT practices of Fuel's network of members.

17. Sonova, believing that Fuel did not have an affiliation with any of its competitors, agreed to provide Fuel with extremely generous and lucrative Revenue Sharing Payments on the basis of Fuel's fraudulent misrepresentations and omissions regarding ownership.

18. The Supply Agreement provided that it would continue for a period of three years, and would renew automatically for two successive one-year renewal terms, unless either party terminated. Neither party terminated the Supply Agreement during the initial term or the two automatic renewal periods. Thus, the Supply Agreement was set to expire of its own terms on February 28, 2022.

19. The Supply Agreement also contained a termination for convenience clause, which provided that either party may terminate the Agreement without cause and for any or no reason whatsoever upon 180 days' prior notice to the other party.

20. Neither party invoked the termination for convenience clause.

**MILLER NASH LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
605 5TH AVE S, STE 900
SEATTLE, WASHINGTON 98104

21.     Pursuant to the express terms of the Supply Agreement, Sonova and Fuel worked together to establish "strategic pricing templates" (the "Templates") for the sale of Sonova's products to Fuel's network members. The various Templates, each of which had its own nomenclature designation, served to set the prices for Sonova products, including any customer discounts and rebates, that would appear on the network members' invoices from Sonova. The Agreement expressly reserved Sonova's sole right to set and/or change its products' list prices at any time. The Agreement further provided that Fuel and Sonova "may, from time to time, change the [Templates] by mutual written agreement of both parties."

22.     At all times, in accordance with the terms of the Supply Agreement, Sonova issued all invoices directly to Fuel's network members for all sales of Sonova's products. Those invoices identified the applicable Template designation and the price of each product as adjusted by the applicable Template. Fuel's members paid those invoices by remitting payment directly to Sonova.

23.     Fuel did not hold title to any of the accounts receivable for the sales of Sonova's products to Fuel's network members.

**II.     The Revenue Sharing Payments and the "Guardrails"**

24.     As part of the Supply Agreement, Sonova negotiated with Fuel that it would pay Fuel certain Revenue Sharing Payments. Sonova entered into the negotiations with the understanding that Fuel was an "independent" buying group, not owned by or affiliated with any of Sonova's competitors. As a result of Sonova's understanding that Fuel was independent, Sonova was open to providing Fuel with more lucrative pricing to help it grow.

25.     Ultimately, the parties agreed that under the Supply Agreement, Fuel would be entitled to Revenue Sharing Payments equating to extremely lucrative percentages of net sales for sales of Sonova products to Fuel's network members, depending on the specific product sold. For example, Sonova agreed to pay Fuel over 30 percent of the net purchase price for its more advanced hearing aids.

SONOVA USA INC.'S FIRST AMENDED COMPLAINT - 6
(Case Nos. 3:23-cv-05544 & 3:22-cv-05934-BHS)

4877-5698-3939.2

**MILLER NASH LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
605 5TH AVE S, STE 900
SEATTLE, WASHINGTON 98104

26.     Sonova agreed to such lucrative Revenue Sharing Payments because it believed that Fuel, as an independent buying group, would not have a bias toward any manufacturer and might later be open to being purchased by Sonova. On multiple occasions, Sonova expressed to Fuel that it was interested in offering financial assistance to accelerate Fuel's growth and potentially purchasing Fuel at some point in the future.

27.     The Supply Agreement also established a floor and a ceiling for monthly net sales prices that could either supplement or reduce the Revenue Sharing Payments made to Fuel. The parties referred to this floor-and-ceiling concept as the "Guardrails." The Guardrails were established by the average selling price ("ASP") of hearing aids sold to Fuel's network members. Under the terms of the Agreement, if the ASP of all hearing aids for a particular month fell below a certain low-end dollar figure (the "ASP Floor"), Sonova would deduct from that month's Revenue Sharing Payment an amount equal to the amount by which the ASP fell below the ASP Floor, multiplied by the number of hearing aids sold that month. On the other end of the Guardrails, if the ASP of all hearing aids for a particular month was in excess of a certain high-end dollar figure (the "ASP Ceiling"), Sonova would pay Fuel an amount equal to the amount by which the ASP exceeded the ASP Ceiling for that month, in addition to that month's standard Revenue Sharing Payment pursuant to the Agreement.

III.    **Business under the Supply Agreement**

28.     In addition to paying Fuel Revenue Sharing Payments and any revenue from Fuel network members in excess of the ASP Ceiling, Sonova agreed to cover certain expenses for Fuel and its network members, such as promotional events and marketing consulting. By way of example, in 2019, Sonova agreed to a funding program where it would provide "Search Engine Marketing" funds to Fuel for every eight premium hearing aid units a Fuel network member purchased. Fuel could then use these funds to provide marketing support for its members.

**MILLER NASH LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
605 5TH AVE S, STE 900
SEATTLE, WASHINGTON 98104

Likewise, Sonova often provided funds to Fuel to sponsor events Fuel offered to its network members.

29.     For approximately the first four years of the life of the Supply Agreement, the Agreement operated on its face as the parties had contemplated it would. During this time, the Guardrails were rarely, if ever, triggered. That is, Sonova made additional payments to Fuel based on a monthly ASP that exceeded the ASP Ceiling on only a few occasions, and it was exceedingly rare (if it happened at all) that Fuel's Revenue Sharing Payment was reduced based on an ASP below the ASP floor. However, that began to change in late 2021.

30.     Beginning in August 2021, and continuing through the expiration of the Supply Agreement, the monthly ASP exceeded the ASP Ceiling every month. The rise in ASP over that period of time was the result of market conditions outside of Sonova's control, including, but not limited to, inflation and supply chain issues, in addition to Sonova's introduction of newer premium technologies.

31.     Sonova was forced to increase list prices in 2022, for the first time in roughly a decade, for certain of its products in an effort to cover the increases in its operating and manufacturing costs, but because the Supply Agreement required it to pay Fuel any amounts that exceeded the ASP Ceiling, it was still unable to adequately cover those costs.

32.     As a direct result of the rise of the monthly ASP exceeding the ASP Ceiling, the Revenue Sharing Payments that Sonova paid to Fuel dramatically increased. These payments were detrimental to Sonova's bottom line in spite of the fact that Fuel was not growing Sonova's business or providing any other additional value to the business relationship.

**IV.     During the Same Time Period, Fuel Made Numerous Fraudulent Statements to Sonova Concerning Its Ownership.**

33.     During the same time period the Supply Agreement was in place, Sonova's personnel in the field occasionally heard rumors from audiologists and ENT groups that Oticon—

**MILLER NASH LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
605 5TH AVE S, STE 900
SEATTLE, WASHINGTON 98104

or its parent company, Demant A/S ("Demant")—had some sort of ownership stake in Fuel. In response, Sonova asked Fuel on several occasions if Demant or Oticon had any ownership stake in Fuel. On each occasion, Fuel denied that a competitor of Sonova had an ownership interest in Fuel and confirmed that Fuel had always remained "independent."

34.     For example, Messrs. Ford and Parker made the following misrepresentations and omissions to Sonova:

a.      On either September 13, 2018, or September 14, 2018, Sonova employee Greg Guggisberg attended the AOA Conference at the Hilton New Orleans Riverside. He was in the hotel's bar restaurant between 8:00 a.m. to 10:00 a.m., where he met with Mr. Parker and asked him about the rumor that Oticon had an ownership stake in Fuel. Mr. Parker responded to Mr. Guggisberg by stating "Fuel is not owned by Oticon" and "anyone can grow within Fuel." Mr. Parker further explained that he believed the speculation in the audiology and ENT market was a result of the fact that Fuel had taken a small loan from Oticon for the funds to purchase Fuel's office building.

b.      Sometime between September 15, 2018, and December 31, 2018, Mr. Guggisberg visited Fuel's Portland office for new product training. Fuel's records will reflect the exact date. During this visit, Mr. Ford told Mr. Guggisberg that "Oticon does not have an ownership interest in Fuel." Mr. Ford reiterated the earlier September 2018 statement by Mr. Parker, explaining that Fuel had merely taken a loan from Oticon to purchase its office building.

c.      In May of 2019, Monica Murray, then a Sonova employee, attended a Fuel Medical Conference in Tennessee. Fuel's records will reflect the exact date and location. During the conference, Ms. Murray had a conversation with Messrs. Ford and Parker, along with Jason Mayer, another Sonova employee, in a hallway, in front of a buffet line, outside of a banquet hall just prior to lunch being served. The four individuals were discussing that Sonova was considering adding another buying group to its portfolio, and the topic of Fuel's ownership came up. Mr. Ford became agitated and defensive. He stated he was "sick of the questions and rumors" that Fuel was owned by Oticon when "there is no truth to them."

d.      Mr. Mayer attended the American Academy of Audiologists Annual Conference at Greater Columbus Convention Center in Columbus, Ohio from March 27 through March 30, 2019. At this meeting, he had a conversation with Mr. Ford during which Mr. Mayer raised Sonova's interest in potentially acquiring Fuel and suggested the parties might engage in due diligence. Mr. Ford declined, reiterating that Fuel "is free and clear of any ties" to a competitor of Sonova and that the only reason for

**MILLER NASH LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
605 5TH AVE S, STE 900
SEATTLE, WASHINGTON 98104

declining due diligence was that Fuel was "currently making too much money to sell."

e.    During 2019, Ms. Murray had four conversations over the telephone with Mr. Ford. Ms. Murray prompted these conversations because Sonova representatives in the field informed Ms. Murray that Fuel representatives were pushing Oticon products over Sonova products. Each time, Ms. Murray contacted Mr. Ford to ask if this was true and whether Fuel had any affiliation with Oticon. Each time, Mr. Ford denied that Oticon had any ownership interest in Fuel. Mr. Ford then requested the names of the representatives making the allegations so he could directly address the question with the representative. Mr. Parker was also on the telephone call in addition to Mr. Ford during one of those four conversations, yet Mr. Parker did not dispute Mr. Ford's denial that Oticon had an ownership interest in Fuel.

f.    Between October 2019 and January 2020, Mr. Ford attended a meeting in Portland, Oregon with Ms. Murray and approximately seven Sonova regional directors. Fuel's records will reflect the exact date. At this meeting, Mr. Ford attempted to address the rumors that Oticon was an owner of Fuel by claiming that they were untrue.

g.    Almost every month, from November 2020 until September 15, 2022, Mr. Guggisberg had conversations with Mr. Ford about rumors Sonova heard from audiologists and ENTs in the field. The audiologists and ENTs had told Mr. Guggisberg that they heard Oticon had an ownership interest in Fuel. During those monthly telephone calls, Mr. Ford repeatedly explained to Mr. Guggisberg that he had heard similar rumors, but denied that they had any validity.

h.    On October 22, 2020, Sonova employee Paul Thompson had a telephone conversation with Messrs. Ford and Parker to discuss Sonova's interest in acquiring Fuel. In response, Messrs. Ford and Parker told Mr. Thompson that Fuel did not have any interest in selling their company at that time. During the course of the conversation, Messrs. Ford and Parker specifically informed Mr. Thompson that a manufacturer, like Sonova, could not replicate what Fuel had built because Fuel's value to its network members was its independence from any manufacturer, emphasizing "the value to our network of our independence from any manufacturer group." They further stated that Fuel was performing well and did "not want to jeopardize this with a manufacturer investment, even a passive one." Mr. Thompson memorialized this conversation in a contemporaneous email.

i.    In the two years preceding March 21, 2022, a then Sonova employee Jeff Dickenson had numerous conversations with Messrs. Ford and Parker in which they discussed whether Fuel had any affiliation or relationship with Oticon. In these conversations, Messrs. Ford and Parker admitted to Mr. Dickenson that Fuel had taken two small loans from Oticon for the limited purposes of providing additional working capital

SONOVA USA INC.'S FIRST AMENDED COMPLAINT - 10
(Case Nos. 3:23-cv-05544 & 3:22-cv-05934-BHS)

4877-5698-3939.2

**MILLER NASH LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
605 5TH AVE S, STE 900
SEATTLE, WASHINGTON 98104

for the Fuel business and, later, to help start a brewery. They, however, omitted any mention of the fact that Oticon had an ownership interest in Fuel. Given the nature of the conversation, Mr. Dickenson reasonably understood that Messrs. Ford and Parker were disclosing the extent of Oticon's relationship with Fuel, such that the omission was relevant and material.

j.   In January 2022, when Fuel and Sonova began to negotiate the new supply agreement, Ms. Murray was on a Teams virtual call with Messrs. Ford and Parker discussing various revisions to the drafts. During that videoconference, Mr. Ford nonchalantly—and for the first time—disclosed that "of course we have a ROFR [right of first refusal] with Oticon." Ms. Murray was shocked because Fuel had never informed Sonova that Oticon held a right of first refusal, notwithstanding the many prior conversations in which Fuel denied or minimized the existence of any relationship with Oticon. Mr. Ford went on to explain that the right of first refusal was merely for a small loan for seed money for a brewery, the loan was almost paid off, and the right of first refusal would expire upon payment. He then expressly denied that Oticon had an ownership interest in Fuel.

35.    Sonova believed Fuel's misrepresentations and omissions designed to conceal Oticon's ownership interest in Fuel and hide that Fuel was not independent of any manufacturer.

36.    If Sonova had known the truth—that its largest competitor, Oticon was a partial owner of Fuel--Sonova would have terminated the relationship, as it was permitted to do under the terms of the Supply Agreement, and certainly would not have allowed the Supply Agreement to automatically renew on the two renewal terms. It also would not have agreed to extensions of the Supply Agreement past the February 28, 2022, termination date while it attempted to negotiate a new supply agreement.

## V.    Negotiation of New Supply Agreement

37.    Since as early as June 2021, Sonova made clear to Fuel that Sonova was evaluating its relationship with Fuel on an ongoing basis, just as it does with all of its strategic business relationships.

38.    Still, despite the dramatic increases in Revenue Sharing Payments and the lack of corresponding growth in sales, Sonova—unaware of Fuel's deception as to Oticon's ownership

**MILLER NASH LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
605 5TH AVE S, STE 900
SEATTLE, WASHINGTON 98104

stake in it—desired to reach agreement with Fuel on a new path forward that would be mutually beneficial.

39. Because the Supply Agreement was set to expire of its own terms on February 28, 2022, Sonova began in or around November 2021 to negotiate the terms of a potential new agreement with Fuel.

40. One of the primary issues that arose during the negotiations was a dispute over the language related to a right of first refusal that would be contained in the new supply agreement. As noted above, in January 2022, Sonova was shocked to learn that its direct competitor, Oticon, had a right of first refusal in Fuel. But, Messrs. Ford and Parker had reassured Sonova that the right of first refusal was tied solely to a small loan for seed money that was almost paid off and would expire upon repayment of the loan.

41. As the February 28, 2022 expiration date approached, the parties had not reached an agreement on the terms of a new supply agreement. In fact, the parties remained far apart on a number of issues, including on how the Revenue Sharing Payments would be calculated. To allow for additional time to review drafts and continue negotiating, Sonova proposed that the parties execute a one-month extension of the Supply Agreement.

42. Sonova would not have suggested or agreed to an extension of the Supply Agreement had it known that Oticon was an owner of Fuel.

43. Sonova and Fuel executed the first one-month extension on February 28, 2022, and extended the Supply Agreement to March 31, 2022. The negotiations continued, and the parties continued to exchange and review redlined drafts of the proposed agreement, throughout the spring and summer of 2022.

44. Ultimately, the parties entered five additional one-month extensions of the Supply Agreement to allow sufficient time for the parties and their respective legal teams to review the proposals and offer counter-proposals. The parties executed a series of one-month extensions that

SONOVA USA INC.'S FIRST AMENDED COMPLAINT - 12
(Case Nos. 3:23-cv-05544 & 3:22-cv-05934-BHS)

**MILLER NASH LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
605 5TH AVE S, STE 900
SEATTLE, WASHINGTON 98104

4877-5698-3939.2

had the effect of extending the Supply Agreement through August 31, 2022. True and correct copies of these amendments are attached hereto as <u>Group Exhibit D</u>.

45.     As August 31, 2022 approached, Sonova was hopeful that the parties were close to agreeing on terms for a new agreement, although significant areas of disagreement remained. Further, once the parties reached mutually agreeable terms, Sonova would need to get approval to sign the agreement from its parent company, a fact Sonova's representatives had repeatedly shared with Fuel.

46.     To provide the requisite time to determine whether a final agreement could be reached and, if so, to allow for the appropriate levels of review and approval, the parties executed two additional extensions of one week each. Pursuant to the second one-week extension, the Supply Agreement was set to expire of its own terms on September 15, 2022.  True and accurate copies of the final two extensions are attached hereto as <u>Group Exhibit E</u>.

47.     Sonova would not have agreed to any of the extensions of the Supply Agreement that are attached as Group Exhibits D and E had it known Oticon was an owner of Fuel.

48.     Sonova continued to negotiate in good faith with Fuel throughout each extension period. As part of those good faith negotiations, Sonova identified areas of the Supply Agreement that needed to change in any new agreement the parties might reach. Those areas included, without limitation, the percentages used to calculate the Revenue Sharing Payments; the elimination of additional Revenue Sharing Payments based on ASPs that exceeded the ASP Ceiling; the specific details as to the calculation of ASP for purposes of determining Revenue Sharing Payments; Sonova's right to evaluate and refuse the addition of new network members; and a disclosure from Fuel of any rights of first refusal or rights of first offer it had granted and/or pledged any significant portion of its equity interest and/or assets to any third party.

49.     Those areas, among others, remained areas of disagreement between Sonova and Fuel up until the time the Supply Agreement finally expired. Indeed, on September 6, 2022, Fuel

SONOVA USA INC.'S FIRST AMENDED COMPLAINT - 13
(Case Nos. 3:23-cv-05544 & 3:22-cv-05934-BHS)

4877-5698-3939.2

**MILLER NASH LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
605 5TH AVE S, STE 900
SEATTLE, WASHINGTON 98104

sent Sonova an updated redlined version of the proposed agreement in which it indicated that it would not agree with Sonova's proposals regarding most of those areas.

50.    During the negotiations, no Sonova employee made any representation to Fuel that could be construed as a promise that the parties would finalize a new supply agreement. Sonova negotiated in good faith at all times and conveyed its genuine willingness and desire to reach new terms that would be beneficial for both parties.

51.    In fact, throughout the negotiations, and as late as August 2022, based upon the continued fraudulent misrepresentations and omissions about Fuel's ownership, Sonova continued to offer discounted pricing via the Templates to newly added Fuel members.

52.    It finally became clear to Sonova in the first half of September 2022, and not before, that the parties' disagreements would not be resolved, and that Fuel would not agree to the terms Sonova deemed necessary for any new supply agreement.

53.    Accordingly, in the first half of September 2022, Sonova's team in the United States held a virtual meeting with the leadership of Sonova's parent company in Switzerland to discuss the state of the negotiations with Fuel. In this meeting, and not before, Sonova decided it would end its attempt to enter a new supply agreement with Fuel and allow the contractual relationship to expire.

## VI.    Expiration of the Supply Agreement

54.    The Supply Agreement was set to expire of its own terms, based on the final one-week extension, on September 15, 2022.

55.    On September 15, 2022, the Sonova team directly involved in the negotiations with Fuel scheduled a call with Fuel's then-known owners Messrs. Ford and Parker. During that call, which took place at approximately 5:00 p.m. Central Time, Sonova informed Messrs. Ford and Parker that Sonova would not be entering a new supply agreement with Fuel. Messrs. Ford and Parker indicated that they were not surprised to hear that news and that they expected such a result.

SONOVA USA INC.'S FIRST AMENDED COMPLAINT - 14
(Case Nos. 3:23-cv-05544 & 3:22-cv-05934-BHS)

4877-5698-3939.2

**MILLER NASH LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
605 5TH AVE S, STE 900
SEATTLE, WASHINGTON 98104

56.     The Supply Agreement expired of its own terms on September 15, 2022.

57.     Soon after the September 15, 2022 call concluded, but not before, Sonova began contacting its customers to inform them that Sonova had ended its relationship with Fuel. On September 16, 2022, Sonova began updating its pricing structures, invoicing procedures, and customer designations to reflect the expiration of the Supply Agreement.

58.     Sonova began competing to retain its customers only after the Supply Agreement expired of its own terms. Sonova did not improperly use or misappropriate any trade secrets or confidential information to do so.

59.     Indeed, the Templates—which are the prices Sonova charges its customers that were members of the Fuel network—belong to Sonova, not Fuel.

60.     After September 15, 2022, Fuel network members remained free to continue to purchase from Sonova—albeit, without Fuel receiving a rebate for the sale—or to purchase from other manufacturers with which Fuel still had supply agreements in place.

61.     In an effort to retain customers that were Fuel network members, Sonova offered new and additional discounts on top of the prices that Sonova previously offered those customers. Sonova did not use any of Fuel's proprietary, confidential, or trade secret information to do so. Sonova set the list prices for its products at all times, including during the operation of the Supply Agreement, and Sonova was solely responsible for invoicing all Fuel network members and always maintained title of all accounts receivable.

**VII.    Sonova Reserves Certain Revenue Sharing Payments upon Termination of Supply Agreement Pending an Accounting of Net Purchases and Past Due Invoices**

62.     Fuel Medical was not entitled to rebates on the sale of products to the extent products: (i) were returned to Sonova for a refund during the permitted 120-day return period (which ended on December 14, 2022); or (ii) were not paid for by the customer within the later of 60 days of the due date or any negotiated longer payment terms.

SONOVA USA INC.'S FIRST AMENDED COMPLAINT - 15
(Case Nos. 3:23-cv-05544 & 3:22-cv-05934-BHS)

4877-5698-3939.2

**MILLER NASH LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
605 5TH AVE S, STE 900
SEATTLE, WASHINGTON 98104

63.     In particular, under Section 5.01 of the Supply Agreement, Fuel Medical earned Revenue Sharing Payments based on Net Purchases made by Network Members. The Supply Agreement defines Net Purchases as "gross purchases of hearing aids and accessories less returns, refunds, allowances, discounts of any nature and promotions."

64.     Section 5.01 further provides that Fuel Medical must refund to Sonova all Revenue Sharing Payments that Fuel Medical received on invoices that are 60 days or more past due.

65.     Upon termination of the Supply Agreement, Sonova reserved $500,000.00 of the September 2022 Revenue Sharing Payments due to Fuel Medical (the "Holdback"). The Holdback was intended to cover rebates on returns and refunds occurring after the termination of the Supply Agreement, as well as rebates for sales where invoices became 60 days or more past due and for which Fuel Medical had already received Revenue Sharing Payments.

66.     From October 1, 2022, through December 14, 2022, Sonova received returns for which it had to issue refunds on sales to Fuel Medical Network Members, which corresponded to $392,873.00 in Revenue Sharing Payments.

67.     On December 29, 2022, Sonova identified unpaid invoiced amounts that were 60 days or more past due from Fuel Network Members.  These unpaid invoices corresponded to $73,883.63 in Revenue Sharing Payments. As of March 31, 2023, Sonova identified additional unpaid invoiced amounts that were 60 days or more past due.  These unpaid invoices corresponded to an additional $171.62 in Revenue Sharing Payments.

68.     Thus, pursuant to Section 5.01 of the Supply Agreement, Sonova is entitled to retain $466,928.25 of the Holdback to cover returns and refunds, as well as unpaid invoices that were 60 days or more past due.

69.     On or about January 6, 2023, Sonova paid Fuel Medical $16,737.92 of the Holdback. Accordingly, Sonova is currently entitled to all but $16,333.83 of the remaining Holdback.

**MILLER NASH LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
605 5TH AVE S, STE 900
SEATTLE, WASHINGTON 98104

## VIII. Fuel Medical Demands $12 Million and Threatens to Sue Sonova, and Sonova Seeks A Declaratory Judgment

70.     On October 20, 2022, Fuel's attorneys sent a letter to Sonova accusing it of supposedly negotiating in bad faith and threatening to sue Sonova if it did not pay $12 million. Fuel also alleged Sonova was supposedly using Fuel's confidential pricing information—presumably, the very prices Sonova charges its customers on its invoices—to compete with Fuel in violation of the confidentiality provisions in the expired 2017 supply agreement and a 2018 non-disclosure agreement (the "NDA"). Fuel's claims against Sonova are without merit. Yet, it claims to have somehow suffered over $119 million in damages.

71.     Sonova felt that it was left with no option but to file its declaratory judgment action to have a court establish the various rights and liabilities of the parties. Thus, it filed the current action in state court in DuPage County, Illinois, where many of the events in question took place and where the parties agreed to submit to jurisdiction under the NDA.

## IX. Fuel Removes this Action to Federal Court, but Continues to Hide Oticon's Ownership Stake

72.     On December 14, 2022, Fuel removed this action from state court to the United States District Court for the Northern District of Illinois claiming that the court had subject matter jurisdiction because complete diversity of citizenship existed.

73.     But, Fuel continued to hide the fact that Oticon was an owner. In its removal statement, Fuel improperly pled diversity in the negative, failing to identify where its members held citizenship. Rather, in its Notice of Removal it identified Sonova's citizenship as Minnesota and Illinois and pled:

> No individual member of Fuel Medical Group, LLC resides in Minnesota or Illinois, and no corporate member of Fuel Medical Group, LLC is organized or has its principal place of business in Minnesota or Illinois; therefore, complete diversity exists between the parties and the case is properly remove to federal court.

SONOVA USA INC.'S FIRST AMENDED COMPLAINT - 17
(Case Nos. 3:23-cv-05544 & 3:22-cv-05934-BHS)

**MILLER NASH LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
605 5TH AVE S, STE 900
SEATTLE, WASHINGTON 98104

4877-5698-3939.2

Dec. 14, 2022 Notice of Removal [Dkt. 1], ¶ 9 (citation omitted). A true and accurate copy of the notice of removal is attached hereto as Exhibit F.

74. The Illinois federal court immediately recognized the impropriety of Fuel's failure to identify its owners and issued a minute order *sua sponte* the very next day. On December 15, 2022, the Illinois federal court ordered Fuel to "identify the citizenship of each of the LLC defendants' members as of the date the complaint was filed." Dec. 15, 2022, Min. Order [Dkt. 5] (quotations omitted). A true and accurate copy of the Dec. 15, 2022, minute order is attached hereto as Exhibit G. The court further warned that "there's no such thing as a [state name here] partnership of LLC, that only the partners' or members' citizenships matter, and that ***their identities and citizenships must be revealed***." *Id.* (citation omitted; emphasis added). It ordered Fuel to file a supplemental jurisdictional statement and cautioned Fuel that it may remand the case if Fuel failed to do so. *Id.* The court set a deadline of January 15, 2023, for Fuel to comply.

75. Despite the court's warning, Fuel continued to conceal Oticon's membership stake in it. On January 13, 2023, Fuel filed a supposed "jurisdictional supplement," but did not identify its owners. Rather, it told only the court "Fuel Medical Group, LLC has three members. The two majority members are individuals residing in Washington State. The third member, which has a minority interest in Fuel Medical Group, LLC, is a California corporation with its principal place of business in New Jersey." Jan. 13, 2023, Def's Juris. State. Supp'l [Dkt. 10]. A true and accurate copy of the jurisdictional supplement is attached hereto as Exhibit H.

76. Meanwhile, on December 21, 2022, Fuel had filed a motion to transfer this action from the Illinois federal court to this court. On January 17, 2023, Sonova filed its opposition brief. In it, Sonova also requested remand due to Fuel's failure to properly identify its members.

77. Realizing that the Illinois federal court would remand this action to state court because Fuel still had not disclosed its ownership, Fuel filed an amended jurisdictional statement on January 20, 2023. In it, Fuel finally admitted that Oticon held an ownership stake in it:

SONOVA USA INC.'S FIRST AMENDED COMPLAINT - 18
(Case Nos. 3:23-cv-05544 & 3:22-cv-05934-BHS)

**MILLER NASH LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
605 5TH AVE S, STE 900
SEATTLE, WASHINGTON 98104

4877-5698-3939.2

As of the date the complaint was filed and continuing today, Fuel Medical Group, LLC has three members. The two majority members, Brendan Ford and Shawn Parker, are citizens of Washington State. **One minority member, Oticon, Inc.**, is a citizen of California . . . and New Jersey."

Jan. 20, 2023 [Dkt. 15] (emphasis added). A true and accurate copy of the amended jurisdictional statement is attached hereto as Exhibit I.

78. This was the first time Fuel admitted that Oticon was an owner of Fuel, revealing that it had been lying to Sonova, as well as the market consisting of audiologists and ENT groups. In truth, Fuel was not independent; and its alleged value to its network members due to its claimed "independence from any manufacturer group" was a fabrication.

79. Fuel undertook similar efforts to hide Oticon's ownership interest before this Court. When Fuel filed its now-dismissed complaint in this Court, it did not disclose its citizenship anywhere in the complaint. Rather, it improperly pled diversity in the negative, the same approach the Illinois federal court rejected. Specifically, Fuel pled the citizenship of Sonova and its parent and merely stated "[n]one of Fuel Medical's members is a citizen of Illinois, Minnesota, or Switzerland." Nov. 29, 2022 [Dkt. 1], ¶3. A true and accurate copy of this page of the Complaint is attached hereto as Exhibit J.

80. Fuel also violated Federal Rule of Civil Procedure 7.1 and Local Rule 7.1 to avoid identifying its ownership. Both rules require a party to file a disclosure statement. The federal rule requires the disclosure statement to be filed with the party's first filing. *See* FRCP 7.1(b) ("A party . . . must: (1) file the disclosure statement with its first appearance, pleading, petition, motion, response, or other request addressed to the court. . . ."). Under the rules, Fuel would have had to "name—and identify the citizenship of—every individual or entity whose citizenship is attributed to" it (*id.* 7.1(2)), which would have included Oticon.

81. Fuel did not file a disclosure statement with its appearance or complaint, both of which it filed on November 29, 2022. Rather, Fuel waited until March 6, 2023, only after Sonova

SONOVA USA INC.'S FIRST AMENDED COMPLAINT - 19
(Case Nos. 3:23-cv-05544 & 3:22-cv-05934-BHS)

**MILLER NASH LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
605 5TH AVE S, STE 900
SEATTLE, WASHINGTON 98104

4877-5698-3939.2

raised this failure in its motion to dismiss and after the Illinois federal court had already forced Fuel to fess up and identify Oticon, to file one.

82. Sonova first learned from Fuel's January 20, 2023, filing before the Illinois federal court that it had been tricked by Fuel.

## COUNT I – DECLARATORY JUDGMENT

83. Sonova incorporates by reference paragraphs 1 through 82 as though fully stated herein.

84. This Court, through Judge Settle, has already dismissed several of Fuel's claims with prejudice, which establishes that Sonova did not breach the Supply Agreement by supposedly failing to give a notice of termination, did not breach the implied covenant of good faith and fair dealing, and is not liable under the doctrine of promissory estoppel for declining to enter into a new supply agreement. *See* June 9, 2023, Order [Dkt. 22].

85. However, an actual controversy continues to exist between the parties to this case, in the form of Fuel persisting in its demand for a monetary payment from Sonova and alleging that Sonova supposedly engaged in bad faith conduct, including supposed fraud and theft of Fuel's trade secrets and confidential information, and that Sonova was not entitled to any portion of the Holdback under the terms of the Supply Agreement.

86. Sonova maintains that it did not engage in fraud and that it did not steal or misappropriate any of Fuel's trade secrets or confidential information. It further maintains that it was entitled to retain $466,928.25 of the Holdback under the terms of the Supply Agreement.

87. Sonova and Fuel are engaged in a concrete dispute admitting of an immediate and definitive determination of the parties' rights, the resolution of which will aid in the termination of the controversy or some part thereof.

SONOVA USA INC.'S FIRST AMENDED COMPLAINT - 20
(Case Nos. 3:23-cv-05544 & 3:22-cv-05934-BHS)

4877-5698-3939.2

**MILLER NASH LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
605 5TH AVE S, STE 900
SEATTLE, WASHINGTON 98104

88.    Accordingly, and for the reasons stated above, Sonova respectfully requests that this Court enter an order stating that Sonova did not engage in fraud and that Sonova did not engage in the theft or misappropriation of any of Fuel's trade secrets or confidential information.

**WHEREFORE**, Plaintiff Sonova USA Inc. respectfully requests that this Court enter an order in its favor and against Defendant Fuel Medical Group, LLC:

   a.   Declaring that Sonova did not breach the confidentiality provision of the parties' supply agreement;

   b.   Declaring that Sonova did not breach the parties' NDA;

   c.   Declaring that Sonova did not engage in fraud during its relationship and contract negotiations with Fuel;

   d.   Declaring that Sonova did not engage in the theft or misappropriation of Fuel's trade secrets;

   e.   Declaring that Sonova did not engage in the theft of misappropriation of Fuel's confidential information;

   f.   Declaring that Sonova was entitled to retain $466,928.25 of the Holdback;

   g.   Awarding Sonova its costs in connection with this matter; and

   h.   Awarding Sonova all other just and equitable relief the Court deems necessary and proper.

## <u>COUNT II – FRAUD</u>

89.    Sonova incorporates by reference paragraphs 1 through 82 as though fully stated herein.

90.    Fuel Medical by and through its members, Brendan Ford and Shawn Parker, made several misrepresentations regarding Oticon's partial ownership of Fuel.

91.    For example, Messrs. Ford and Parker made the following misrepresentations and omissions to Sonova:

   a.   On either September 13, 2018, or September 14, 2018, Sonova employee Greg Guggisberg attended the AOA Conference at the Hilton New Orleans Riverside. He was in the hotel's bar restaurant between 8:00 a.m. to 10:00 a.m., where he met with Mr. Parker and asked him about the rumor that Oticon had an ownership

SONOVA USA INC.'S FIRST AMENDED COMPLAINT - 21
(Case Nos. 3:23-cv-05544 & 3:22-cv-05934-BHS)

4877-5698-3939.2

**MILLER NASH LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
605 5TH AVE S, STE 900
SEATTLE, WASHINGTON 98104

stake in Fuel. Mr. Parker responded to Mr. Guggisberg by stating "Fuel is not owned by Oticon" and "anyone can grow within Fuel." Mr. Parker further explained that he believed the speculation in the audiology and ENT market was a result of the fact that Fuel had taken a small loan from Oticon for the funds to purchase Fuel's office building.

b.    Sometime between September 15, 2018, and December 31, 2018, Mr. Guggisberg visited Fuel's Portland office for new product training. Fuel's records will reflect the exact date. During this visit, Mr. Ford told Mr. Guggisberg that "Oticon does not have an ownership interest in Fuel." Mr. Ford reiterated the earlier September 2018 statement by Mr. Parker, explaining that Fuel had merely taken a loan from Oticon to purchase its office building.

c.    In May of 2019, Monica Murray, then a Sonova employee, attended a Fuel Medical Conference Tennessee. Fuel's records will reflect the exact date and location. During the conference, Ms. Murray had a conversation with Messrs. Ford and Parker, along with Jason Mayer, another Sonova employee, in a hallway, in front of a buffet line, outside of a banquet hall just prior to lunch being served. The four individuals were discussing that Sonova was considering adding another buying group to its portfolio, and the topic of Fuel's ownership came up. Mr. Ford became agitated and defensive. He stated he was "sick of the questions and rumors" that Fuel was owned by Oticon when "there is no truth to them."

d.    Mr. Mayer attended the American Academy of Audiologists Annual Conference at Greater Columbus Convention Center in Columbus, Ohio from March 27 through March 30, 2019. At this meeting, he had a conversation with Mr. Ford during which Mr. Mayer raised Sonova's interest in potentially acquiring Fuel and suggested the parties might engage in due diligence. Mr. Ford declined, reiterating that Fuel "is free and clear of any ties" to a competitor of Sonova and that the only reason for declining due diligence was that Fuel was "currently making too much money to sell."

e.    During 2019, Ms. Murray had four conversations over the telephone with Mr. Ford. Ms. Murray prompted these conversations because Sonova representatives in the field informed Ms. Murray that Fuel representatives were pushing Oticon products over Sonova products. Each time, Ms. Murray contacted Mr. Ford to ask if this was true and whether Fuel had any affiliation with Oticon. Each time, Mr. Ford denied that Oticon had any ownership interest in Fuel. Mr. Ford then requested the names of the representatives making the allegations so he could directly address the question with the representative. Mr. Parker was also on the telephone call in addition to Mr. Ford during one of those four conversations, yet Mr. Parker did not dispute Mr. Ford's denial that Oticon had an ownership interest in Fuel.

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
605 5TH AVE S, STE 900
SEATTLE, WASHINGTON 98104

f.  Between October 2019 and January 2020, Mr. Ford attended a meeting in Portland, Oregon with Ms. Murray and approximately seven Sonova regional directors. Fuel's records will reflect the exact date. At this meeting, Mr. Ford attempted to address the rumors that Oticon was an owner of Fuel, by claiming that they were untrue.

g.  Almost every month, from November 2020 until September 15, 2022, Mr. Guggisberg had conversations with Mr. Ford about rumors Sonova heard from audiologists and ENTs in the field. The audiologists and ENTs had told Mr. Guggisberg that they heard Oticon had an ownership interest in Fuel. During those monthly telephone calls, Mr. Ford repeatedly explained to Mr. Guggisberg that he had heard similar rumors, but denied that they had any validity.

h.  On October 22, 2020, Sonova employee Paul Thompson had a telephone conversation with Messrs. Ford and Parker to discuss Sonova's interest in acquiring Fuel. In response, Messrs. Ford and Parker told Mr. Thompson that Fuel did not have any interest in selling their company at that time. During the course of the conversation, Messrs. Ford and Parker specifically informed Mr. Thompson that a manufacturer, like Sonova, could not replicate what Fuel had built because Fuel's value to its network members was its independence from any manufacturer, emphasizing "the value to our network of our independence from any manufacturer group." They further stated Fuel was hitting record sales and they did "not want to jeopardize this with a manufacturer investment, even a passive one." Mr. Thompson memorialized this conversation in a contemporaneous email.

i.  In the two years preceding March 21, 2022, a then Sonova employee Jeff Dickenson had numerous conversations with Messrs. Ford and Parker in which they discussed whether Fuel had any affiliation or relationship with Oticon. In these conversations, Messrs. Ford and Parker admitted to Mr. Dickenson that Fuel had taken two small loans from Oticon for the limited purposes of providing additional working capital for the Fuel business and, later, to help start a brewery. They, however, omitted any mention of the fact that Oticon had an ownership interest in Fuel. Given the nature of the conversation, Mr. Dickenson reasonably understood that Messrs. Ford and Parker were disclosing the extent of Oticon's relationship with Fuel, such that the omission was relevant and material.

j.  In January 2022, when Fuel and Sonova began to negotiate the new supply agreement, Ms. Murray was on a Teams virtual call with Messrs. Ford and Parker discussing various revisions to the drafts. During that videoconference, Mr. Ford nonchalantly—and for the first time—disclosed that "of course we have a ROFR [right of first refusal] with Oticon." Ms. Murray was shocked because Fuel had never informed Sonova that Oticon held a right of first refusal, notwithstanding the many prior conversations in which Fuel denied or minimized the existence of any relationship with Oticon. Mr. Ford went on to explain that the right of first refusal

MILLER NASH LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
605 5TH AVE S, STE 900
SEATTLE, WASHINGTON 98104

was merely for a small loan for seed money for a brewery, the loan was almost paid off, and the right of first refusal would expire upon payment. He then expressly denied that Oticon had an ownership interest in Fuel.

92.     Sonova reasonably relied on the fraudulent misrepresentations and omissions by Fuel. Specifically, Sonova reasonably relied on Fuel's representation that it was independent from, and not owned by, a competitor.

93.     Sonova's reliance was to its detriment because it provided Fuel with lucrative pricing, including, but not limited to, the most advantageous discounts and rebates in the Revenue Sharing Payments and the Guardrails, which it does not provide to any buying groups that are affiliated with a competitor. In fact, if Sonova's contractual arrangements with Fuel were similar to the contractual arrangements Sonova has with buying groups that it knows to be owned by competitors, Sonova would have paid Fuel nearly fifty million dollars less over the five and a half years the Supply Agreement was in effect. Further, it would not have agreed to cover expenses, such as promotional events and marketing consulting, for Fuel and its network members.

94.     Fuel knew its representations that it was independent, that it was not affiliated with a manufacturer, and that Oticon had no ownership interest in Fuel, were false and that Sonova would reasonably rely on these false representations when negotiating financial terms given to Fuel.

95.     Had Sonova known the truth about Oticon's ownership stake in Fuel, Sonova would have terminated the Supply Agreement and certainly not extended it. Rather, Sonova would have offered Fuel less lucrative pricing and rebates comparable to those it provides to other buying groups that are affiliated with other manufacturers. And, it would not have provided other payments to Fuel, such as under the Search Engine Marketing program or sponsorship of Fuel events. Instead, as a result of Fuel's ongoing false representations and omissions of material fact, Sonova provided Fuel with lucrative pricing resulting in overpayment to Fuel and damages to Sonova.

**MILLER NASH LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
605 5TH AVE S, STE 900
SEATTLE, WASHINGTON 98104

1     96.    Had Fuel not entered into the Supply Agreement with Sonova by fraudulently misrepresenting its ownership, Sonova would have agreed to provide Fuel with financial terms similar to those that it would provide to a buying group in which a competitor has a known affiliation. In fact, when comparing Fuel's financial terms to the financial terms that Sonova has with a similar buying group in which Oticon has a known ownership interest, the more favorable financial terms provided to Fuel resulted in damages in the amount of nearly fifty million dollars to Sonova over the parties' five and a half year contractual relationship.

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

**MILLER NASH LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
605 5TH AVE S, STE 900
SEATTLE, WASHINGTON 98104

**WHEREFORE**, Plaintiff Sonova USA Inc. respectfully requests that this Court enter an order in its favor and against Defendant Fuel Medical Group, LLC:

    a.   Granting judgment for Sonova against Fuel;

    b.   Awarding Sonova its actual damages in an amount to be proven at trial;

    c.   Awarding Sonova its costs of suit; and

    d.   Awarding Sonova all other just relief the Court deems necessary and proper.

Dated: October 2, 2023.

Respectfully submitted,

/s/ *Brian W. Esler*

Brian W. Esler, WSBA No. 22168
Lane Conrad, WSBA No. 59287
Miller Nash LLP
605 5th Ave S, Ste 900
Seattle, WA 98104
Telephone: (206) 624-8300
Email: brian.esler@millernash.com
Email: lane.conrad@millernash.com

Ian H. Fisher, admitted *pro hac vice*
Paul J. Coogan, admitted *pro hac vice*
Taft Stettinius & Hollister LLP
111 East Wacker Drive, Ste 2600
Chicago, IL 60601
Telephone: (312) 527-4000
Email: ifisher@taftlaw.com
Email:    pcoogan@taftlaw.com

Attorneys for Plaintiff Sonova USA Inc.

SONOVA USA INC.'S FIRST AMENDED COMPLAINT - 26
(Case Nos. 3:23-cv-05544 & 3:22-cv-05934-BHS)

4877-5698-3939.2

**MILLER NASH LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
605 5TH AVE S, STE 900
SEATTLE, WASHINGTON 98104

1

2                        CERTIFICATE OF SERVICE

3          I hereby certify that I electronically filed the foregoing with the Clerk of the Court using

4   the CM/ECF system which will send notification of such filing to the attorneys of record for the

5   parties.

6          DATED this 2nd day of October, 2023.

7

8                                              */s/ Kristin Martinez Clark*
                                               _____
9                                              Kristin Martinez Clark

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**MILLER NASH LLP**
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
605 5TH AVE S, STE 900
SEATTLE, WASHINGTON 98104

# EXHIBIT A

## SUPPLY AGREEMENT

THIS SUPPLY AGREEMENT (this **"Agreement"**) is effective as of March 1, 2017 (the "Effective Date") by and among Phonak, LLC, a Delaware limited liability company ("Phonak"), Unitron Hearing, Inc., a Minnesota corporation ("Unitron"), and FUEL MEDICAL GROUP, LLC, a Washington limited liability company with offices located at 314 NE Birch St., Camas, WA 98607 (hereinafter referred to as **"Fuel Medical"**). Phonak and Unitron are hereinafter collectively referred to as **"Supplier"**.

### RECITALS

A. Fuel Medical is a company that specializes in practice management for Ear, Nose & Throat and Multi-Specialty Physicians with the goal of growing their private-pay revenue (including but not limited to Audiology, Allergy, Cosmetic Surgery, Pediatrics, Sinus Procedures, Head & Neck Surgeries and Sleep Apnea Treatment).

B. Members of Fuel Medical (**"Fuel Medical Network"**) share best practice strategies to improve overall patient satisfaction, operational efficiencies and staff retention.

C. Supplier is a manufacturer of hearing instruments and related accessories that it sells to physician, private practice audiology and hearing instrument dispensing businesses.

D. Fuel Medical and Supplier wish to enter into a supply agreement to provide for the terms and conditions under which Supplier will manufacture and sell hearing instruments directly to the Network Members (as defined below in Section 1.01).

NOW, THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties, intending to be legally bound, agree as follows:

### ARTICLE 1
### DEFINITIONS

1.01 *Defined Terms*. As used in this Agreement, the following terms shall have the meanings specified below:

**"Affiliate"** means, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with such Person. For purposes of this definition, the term "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

**"Change of Control"** means , with respect to a party: (a) the liquidation or dissolution of a party or the sale or other transfer by a party of all or a significant part of its assets; or (b) the occurrence of a tender offer, stock purchase, other stock acquisition, merger, consolidation, recapitalization, reverse split, sale or transfer of assets or other transaction, as a result of which any person, entity or group (i) becomes the beneficial owner, directly or indirectly, of respective securities of a party representing more than 50% of the capital stock of a party or representing more than 50% of the combined voting power with respect to the election of directors (or members of any other governing body) of a party, (ii) obtains the ability to

1

appoint a majority of the Board of Directors (or other governing body) of a party, or (iii) obtains the ability to direct the operations or management of a party or any successor to the business of a party.

"**Confidential Information**" has the meaning set forth in Section 7.04.

"**Disclosing Party**" has the meaning set forth in Section 7.04.

"**Initial Term**" has the meaning set forth in Section 2.01.

"**Net Purchases**" has the meaning set forth in Section 5.01

"**Network Member**" means any hearing instrument dispensing business that is a member of the Fuel Medical Network (including all of its "bill to" and "ship to" locations) and that has signed a Manufacturer Release Form and for whom Fuel Medical has provided written notification to Supplier of membership in the Fuel Medical Network as provided in Section 3.01 of this Agreement.

"**Person**" means an individual, corporation, limited liability company, partnership, association, trust or other entity or organization, including a government or political subdivision or an agency or instrumentality thereof other than the parties to this Agreement.

"**Receiving Party**" has the meaning set forth in Section 7.04.

"**Reimbursable Product**" has the meaning set forth in Section 3.03.

"**Renewal Term**" has the meaning set forth in Section 2.01.

"**Sales Information**" has the meaning set forth in Section 5.02.

"**Term**" has the meaning set forth in Section 2.01.

"**Trademarks**" has the meaning set forth in Section 7.05.

"**Supplier Products**" means those products listed on Schedule 1.01 attached to and made a part of this Agreement and any other products that the parties mutually agree to in writing outside of this Agreement, without the need to formally amend this Agreement. Schedule 1.01 may be amended from time to time by written agreement of Supplier and Fuel Medical.

"**Supplier Sales Policies**" has the meaning set forth in Section 4.01.

## ARTICLE 2
## TERM OF AGREEMENT, TERMINATION AND NON-EXCLUSIVITY

2.01    *Term*. This Agreement shall be effective as of the Effective Date and shall continue thereafter in full force and effect for a period of three (3) years (the "**Initial Term**") unless it is terminated on an accelerated basis as outlined in Section 2.02 or Section 2.03 below. This Agreement shall be thereafter automatically renewed for two (2) successive renewal terms of one (1) year each (each, a "**Renewal Term**", and with the Initial Term, the "**Term**") unless earlier terminated by either Supplier or Fuel Medical as provided for herein.

2.02    *Termination Without Cause*. Each party may terminate this Agreement upon one hundred eighty (180) days' prior written notice to the other party without cause and for any or no reason whatsoever.

2.03    *Termination With Cause*. Each party shall have the right and option to immediately terminate this Agreement if the other party has breached any term or provision of this Agreement and has failed to cure such breach within thirty (30) days following receipt of written notice from the non-breaching party, which written notice shall specify in detail the nature of the alleged breach. In addition, Supplier shall have the right to immediately terminate this Agreement if Fuel Medical (i) becomes insolvent or is unable to pay its debts as such debts become due, (ii) makes a general assignment for the benefit of creditors or makes any insolvent assignment, or a receiver for all or a portion of its property is appointed, (iii) commences a voluntary case under the Federal Bankruptcy Code (as now or hereafter in effect), (iv) applies for, consents to or permits the appointment of a receiver, trustee or liquidator, (v) files a petition seeking to take advantage of any other law relating to bankruptcy, insolvency, or adjustment of debts, (v) has instituted against it any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings for relief under the Federal Bankruptcy Code or any other law relating to bankruptcy, insolvency or adjustment of debts, or (vi) takes any action for the purposes of effecting any of the foregoing.

## ARTICLE 3
## SALES COVERED BY THIS AGREEMENT

3.01    *Network Members*. Any Person shall be a Network Member under this Agreement by and upon such Person's execution of a Manufacturer Release Form (attached as Exhibit B), written notification to Supplier from Fuel Medical of such Person's Fuel Medical Network membership, and upon a satisfactory credit report obtained by Supplier and credit approval by Supplier which such satisfactory nature and approval shall be in Supplier's sole and absolute discretion. Fuel Medical acknowledges and agrees that Supplier shall have the right, in its reasonable discretion to elect not to do business with any Network Member under this Agreement or decline to accept any specific order from any Network Member. Fuel Medical shall promptly notify Supplier if any Network Member shall cease to be a member in good standing. In the event Supplier is notified by Network Member of a change in its Fuel association, Supplier shall promptly notify Fuel if any Network Member requests the removal of the Fuel Medical association from their account with Supplier and Supplier shall advise Network Member of its contractual requirement with Fuel to notify Fuel directly of such changes.

3.02    *Covered Sales*. This Agreement provides for the terms and conditions under which Supplier will manufacture and sell the Supplier Products to the Network Members. Any and all sales of Supplier Products, other than the Excluded Sales described in Section 3.03, to Network Members will be consider Covered Sales during the term of this Agreement. Notwithstanding anything in this Agreement to the contrary, however, to be entitled to benefits under this Agreement, each of the Network Members must meet the requirements of this Agreement. Without limiting the generality of the foregoing (and without limiting the rights of Supplier under Section 4.05 hereof), Supplier shall have no obligation to accept orders from, or sell Supplier Products to, any Network Member that has failed to pay for Supplier Products within 60 days overdue from Network Member's payment terms.

3.03    *Excluded Sales*. Notwithstanding anything to the contrary contained in this Agreement, the parties acknowledge and agree that this Agreement shall not cover any Supplier Products that are reimbursable by any federal or state health care program, including Medicare or Medicaid (a "**Reimbursable Products**"). Fuel Medical acknowledges and agrees that Supplier shall be permitted to sell such Reimbursable Products directly to such Network Member outside the terms of this Agreement and to use separate billing accounts with respect thereto.

3.04    *No Exclusivity*. Nothing contained in this Agreement is intended to create any type of exclusive relationship between Fuel Medical and Supplier. Without limiting the foregoing, Supplier retains the right, in its sole discretion (a) to sell the Products to any other parties for resale to end users and (b) to

3

promote, market, sell and service the Products to end users directly or through any Affiliate. Without limiting the foregoing, Fuel Medical retains the right, in its sole discretion to establish new and/or maintain any supply, marketing, licensing, sales or other agreements with any Person.

## ARTICLE 4
## NETWORK MEMBER SALES

4.01 *Ordering and Sale Terms*. Network Member orders for Supplier Products shall be strictly subject to Supplier's customary terms and conditions of sale in effect from time to time (the "Supplier Sales Policies"). The Supplier Sales Policies are subject to revision or modification at any time by Supplier, in its sole and absolute discretion; provided; however, that in the event of any conflict between the Supplier Sales Policies, and any terms or conditions of this Agreement, the terms or conditions of this Agreement shall govern and control.

4.02 *Network Member Pricing*. During the Term of this Agreement, Supplier and Fuel Medical shall establish and maintain strategic pricing templates for the Network Members. Fuel Medical and Supplier may, from time to time, change the strategic pricing templates by mutual written agreement of both parties, which such agreement shall not require a formal amendment to this Agreement. Nothing contained in this Agreement shall be construed as limiting Supplier's right to change its published list prices at any time, in its sole and absolute discretion. New pricing templates and changes to existing pricing templates shall be implemented within five (5) business days upon formal request to the appropriate internal business groups of Supplier. Moving Network Members from one pricing template to another pricing template shall be implemented within three (3) business day upon formal request to the appropriate internal business groups of Supplier. Pricing changes shall not be effective retroactively, unless mutually agreed to by both Fuel Medical and Supplier.

4.03 *Payment*. Supplier shall invoice the Network Members directly for purchases under this Agreement. Payment for any Supplier Product purchased under this Agreement shall be made within the payment policy established by Supplier with the Network Member. Each Network Member shall pay for any and all shipment costs for the Supplier Products, as reflected on the relevant invoice. Title and risk of loss or damage to the Supplier Products will remain with Supplier until the Products are actually received at the Network Member's location.

4.04 *Purchases for Resale Only*. The Supplier Products purchased by the Network Members under this Agreement may only be sold directly by such Network Member directly to individual consumers in the United States, in the ordinary course of the Network Member's business, for the consumer's personal use and not be sold to any other resellers or dispensing locations without the prior consent of Supplier which may be withheld in its sole and absolute discretion. Supplier Products that are purchased by the Network Members outside the United States must be approved by Supplier prior to any order being placed. The Network Members shall not sell Supplier Products with the Supplier trademark through TV sales, the internet or by means of catalog or mail order, without prior written permission from Supplier.

4.05 *Network Member Failure to Meet Requirements of this Agreement*. Fuel Medical shall inform each Network Member of its commitments and obligations under this Agreement and monitor compliance with such commitments and obligations. In the event that any Network Member fails to comply with any of the requirements of this Agreement, without limiting any other right or remedy available to Supplier, Supplier shall have the right and option to immediately terminate the Network Member's participation in this Agreement or to place a shipping hold on such Network Member account, by and upon notice to Fuel Medical who will in turn notify the Network Member. Such termination or shipping hold of a specific Network Member's participation in this Agreement will not impact the other Network Members' participation in this Agreement. In the event Fuel Medical becomes aware (or is notified by Supplier) that

4

a Network Member is violating any of the terms and conditions contained in this Agreement, Fuel Medical covenants and agrees to give notice thereof to Supplier in accordance with Section 7.09 hereof and notify the Network Member to promptly cure such violation. In addition, if Supplier commences an action against a particular Network Member as a result of Network Member 's violation of the terms and conditions of this Agreement, then upon the request of Supplier, Fuel Medical agrees, at no cost to Supplier apart from reimbursement of reasonable expenses, to cooperate with Supplier in any enforcement action. Provided Fuel Medical complies with the terms of this Section, Fuel Medical will have no liability to Supplier due to a violation of this Agreement by a Network Member.

## ARTICLE 5
## SUPPLIER PAYMENTS TO FUEL MEDICAL

5.01    *Revenue Sharing Payments*. Revenue Sharing Payments shall be due and payable, from Supplier to Fuel Medical, in-full, on a monthly basis, on or before the fifteenth (15th) day following the end of each month for all Net Purchases made by Network Members of Supplier Products during that prior month. Network Member pricing templates shall be provided by Supplier to Fuel Medical electronically.

For purpose of this Agreement **"Net Purchases"** shall mean gross purchases of hearing aids and accessories less returns, refunds, allowances, discounts of any nature and promotions. All discounts and promotions must be approved in writing by Fuel Medical. If a Revenue Sharing Payment has already been paid on Net Purchases where full payment has not been received from the Network Member within one hundred twenty (120) days of being invoiced, such Revenue Sharing Payment shall be charged back to Fuel Medical and Supplier shall be entitled to set-off any sums so due against future Revenue Sharing Payments. For the avoidance of doubt, all Revenue Sharing Payments shall continue to be earned after any notice of intent to terminate has been given pursuant to Sections 2.02 or 2.03 until the actual date of termination and any Revenue Sharing Payments earned during the term of this Agreement shall be paid by Supplier notwithstanding termination of this Agreement. Furthermore, in the event of a notification of termination, Supplier may reserve 20% of the monthly Revenue Sharing Payments during the final 60 days of the one hundred eighty (180) day termination notice period to cover the potential of any returns after the termination date. Supplier shall pay Fuel Medical any remaining amounts from such reserve within 90 days following the termination of this Agreement; provided, however, that if the reserve has been depleted and there are outstanding invoices which are 60 days or more past due and for which Fuel Medical has received Revenue Sharing Payments, then Fuel Medical shall promptly refund such excess Revenue Sharing Payments to Supplier.

Subject to the limitations set forth in Section 5.02 hereof, Supplier shall pay to Fuel Medical, Revenue Sharing Payments equal to the following percentages multiplied by the Net Purchases made by Network Members of Supplier Products:

| Supplier Products | Revenue Sharing Payment |
|---|---|
| Premium Hearing Aids | % of Net Purchases |
| Advanced Hearing Aids | % of Net Purchases |
| Standard Hearing Aids | % of Net Purchases |
| Essential Hearing Aids | % of Net Purchases |
| Accessories | % of Net Purchases |

5.02    *Limitations Upon Payment of Revenue Sharing Payments*. In the event the average selling price ("ASP") of all Net Purchases of hearing aids for a relevant month falls below $ (the "ASP Floor"), Supplier shall deduct from that relevant month's Revenue Sharing Payment an amount equal to the amount by which the ASP of all Net Purchases of hearing aids for that month falls below the ASP Floor, multiplied by the number of Net Purchases of hearing aids less $0 value units purchased during such

5

month. In the event the ASP of all Net Purchases of hearing aids for a relevant month is in excess of $▮ (the "ASP Ceiling"), Supplier shall pay to Fuel an additional amount equal to the amount by which the ASP of all Net Purchases of hearing aids for that month exceeds the ASP Ceiling, multiplied by the number of Net Purchases of hearing aids less $0 value units purchased during such month. In no event will the total Revenue Sharing Payment for Net Purchases of hearing aids, regardless of the ASP, for a given month be less than ▮ or more than ▮ of the total Net Purchases of hearing aids made by Network Members. During the first 6 months of the Agreement, the limitations set forth in this Section 5.02 shall not apply to either Phonak or Unitron. During that same initial 6 month period, Supplier and Fuel Medical shall meet and confer at least on a monthly basis to review the ASP of all Net Purchases as well as the volume of sales achieved through this Agreement. In addition the parties will assess the treatment of ▮ purchases described below. No later than the end of the initial 6-month period, Supplier and Fuel Medical shall either agree to the ASP Floor and ASP Ceiling amounts listed in this section or agree to modify the ASP Floor and ASP Ceiling amounts for all Net Purchases under this section for the remainder of any Term of this Agreement.

For purposes of the limitations set forth in this Section 5.02, Supplier's ASP (in the aggregate) will include all promotional units, which were approved by Fuel Medical in writing prior to such promotion, and will specifically include all Revenue Sharing Payments except Lyric. The Revenue Sharing Payments shall include the Revenue Sharing Payments set forth on Section 5.01 and will specifically include the Revenue Sharing Payments paid out for ▮ and SELECT ENTs. ASP will not include or be impacted in any way by accessories or Lyric.

The ▮ Revenue Sharing Payment will be paid out as follows: Fuel Medical will be paid ▮ on total ▮ purchases (on an aggregate Supplier basis) per month. Fuel Medical will earn an additional ▮ on the purchases above $▮ (the "▮ Baseline") on total ▮ purchases (on an aggregate Supplier basis) per month

SELECT ENT Revenue Sharing Payment will be paid out as follows: Fuel Medical will be paid ▮ on hearing instrument purchases and ▮ on purchases of accessories. Supplier and Fuel Medical will mutually agree to those members who will be Network Members for SELECT ENT and will also mutually agree to pricing and to current and future changes relative to SELECT ENT Network Members. Senior management for both Fuel and Supplier must agree in writing to price changes implemented for SELECT ENT Network Members.

The limitations set forth herein specifically exclude the following rebates:

Lyric rebates will be calculated separately. Phonak will pay ▮ for Fuel Network Members. The Lyric rebates will be paid monthly and will be paid based on the Fuel monthly membership report and the monthly Phonak Lyric report. Net monthly subscription is defined as a new subscription or renewal subscription offset set by any subscription cancellations.

5.03     *Network Members Sales Reports*. So long as this Agreement is in effect, Supplier shall maintain accurate books and records of sales to Network Members, and use its commercially reasonable efforts to provide Fuel Medical with access to the following reports/information:

(i)     weekly reports /information of Network Member purchases showing unit quantities and dollar amounts (net of returns) (the "**Sales Information**") for purchases during the previous calendar week;

6

(ii)     monthly reports/information showing the Sales Information for the previous month, and the Revenue Sharing Payments due to Fuel Medical with respect to such purchases;

(iii)     on or before the tenth (10th) day of each month, with respect to each Network Member, Fuel Medical may choose to obtain a Supplier "Statement of Account" for the previous month.

(iv)     upon activation of, and receipt of written authorization from, each new Network Member, Supplier will supply Fuel Medical with a report that details the unit quantities and dollar amounts (net of returns) such new Network Member had during the 6-month period prior to becoming a Network Member for purposes of this Agreement.

5.04     *Right to Review Supplier Records.*  Upon fifteen (15) days' notice to Supplier, Fuel Medical, at its own expense, shall have the right at any time during regular business hours, not more frequently than annually, to have an independent accountant selected by mutual agreement to review the books and records of Supplier limited to the information related to purchases made by the Network Members to the extent necessary to verify Supplier's statements and payments to Fuel Medical. Such records shall be made available to Fuel Medical at Supplier's office located at address stated in Section 7.09. Supplier shall cooperate with and assist Fuel Medical for the purpose of facilitating such review. The accountant shall not disclose to Fuel Medical any information, from or results of such audit except the amount by which the accountant believes the purchases made by the Network Members are misstated. If, as a result of such review, Fuel Medical determines that the amount of payments due was different than the amount reported by Supplier in monthly reports, Fuel Medical, shall promptly furnish to Supplier a copy of its findings setting forth the difference showing, in reasonable detail, the basis upon which such deficiency was determined. Either party shall promptly remit to the other party a sum equal to such difference so claimed, within 30 days' notice.

### ARTICLE 6
### PRODUCT WARRANTY; TRAINING AND SUPPORT;
### PRODUCT LABELING; UPDATED PRODUCT OFFERINGS

6.01     *Limited Warranty.*  Supplier will provide Warranty and Loss & Damage periods, as outlined in the Strategic Pricing Templates, for each Supplier Product. EXCEPT FOR THE SUPPLIER'S WARRANTY, SUPPLIER MAKES NO OTHER REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, WITH RESPECT TO THE PRODUCTS SOLD PURSUANT TO THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR ANY OTHER MATTER.

6.02     *Disclaimer.*  IN THE EVENT ANY WARRANTY OR REMEDY OFFERED BY SUPPLIER FAILS OF ITS ESSENTIAL PURPOSE, FUEL MEDICAL AND EACH NETWORK MEMBER'S SOLE AND EXCLUSIVE REMEDY WILL BE THE LESSER OF (A) FUEL MEDICAL'S AND EACH NETWORK MEMBER'S ACTUAL DAMAGES OR (B) RETURN OF THE PURCHASE PRICE PAID FOR THE DEFECTIVE PRODUCT. IN NO EVENT, WHETHER FOR BREACH OR WARRANTY, NEGLIGENCE OR OTHERWISE, WILL SUPPLIER BE LIABLE TO FUEL MEDICAL, ANY NETWORK MEMBER OR TO ANY USER OF THE PRODUCTS FOR LOSS OF PROFITS, LOSS OF USE, CONSEQUENTIAL, PUNITIVE, SPECIAL OR INCIDENTAL DAMAGES, OR PECUNIARY LOSS OF ANY KIND. NOTICE OF ANY CLAIMS CONCERNING THE PRODUCTS OR THIS AGREEMENT MUST BE MADE IN WRITING AND FURNISHED BY FUEL MEDICAL OR A NETWORK MEMBER TO SUPPLIER PROMPTLY UPON DISCOVERY AND IN NO EVENT LATER THAN SIXTY (60) DAYS AFTER THE END OF THE APPLICABLE WARRANTY. IN NO EVENT MAY ANY ACTION OR PROCEEDING CONCERNING THE PRODUCTS OR THIS AGREEMENT BE FILED BY FUEL MEDICAL OR ANY NETWORK MEMBER MORE THAN ONE

(1) YEAR AFTER DELIVERY OF THE PRODUCTS CLAIMED TO BE DEFECTIVE OR UNSUITABLE OR, IN THE CASE OF OTHER CLAIMS CONCERNING THIS AGREEMENT, MORE THAN ONE YEAR AFTER SUCH CLAIM AROSE. IF FUEL MEDICAL OR ANY NETWORK MEMBER FAILS TO GIVE SUPPLIER NOTICE AS REQUIRED BY THIS SECTION 6.02 WITHIN THE SPECIFIED PERIOD, FUEL MEDICAL AND EACH NETWORK MEMBER WILL THEREAFTER BE BARRED FROM ASSERTING THE CLAIM FOR WHICH NOTICE WAS REQUIRED.

6.03 *Network Member Support*. It is the intent of the parties hereto for the services provided by Fuel Medical to the Network Members to be in addition to and not in lieu of the services Network Members may receive from Supplier outside of this Agreement. Therefore, Supplier will provide sales, training, and business development support to Fuel Medical and the Network Members as mutually-agreed upon by the parties as necessary and appropriate from time-to-time to market the Supplier Products.

## ARTICLE 7
## MISCELLANEOUS

7.01 *Representations and Warranties of Fuel Medical*. Fuel Medical represents and warrants to Supplier that on and as of the Effective Date, and continuously throughout any Term of this Agreement:

(i) it is a duly organized and existing limited liability company under the laws of the state of Washington;

(ii) it is duly authorized to enter into, deliver and perform this Agreement and the transactions contemplated hereunder;

(iii) this Agreement constitutes a valid and binding obligation of Fuel Medical, enforceable in accordance with its terms, except as the same may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to the enforcement of creditors' rights generally or by principles governing the availability of equitable remedies;

(iv) its execution and delivery of, its performance and the performance of the Network Members under, and the consummation of the transactions contemplated by, this Agreement do not and will not conflict with or violate: (a) any provision of any agreement to which it, or any of its Affiliates, are parties; (b) any agreement between Fuel Medical and any Network Member; or (c) any provision of its organizational documents; and

(v) it is not a "Group Purchasing Organization" as that term is defined in 42 C.F.R. §1001.952(j). In the event at any time throughout any Term of this Agreement, Fuel Medical is organized as a Group Purchasing Organization, the parties agree to amend this Agreement as required by law.

7.02 *Representations and Warranties of Supplier*. Phonak and Unitron, respectively, each represent and warrant to Fuel Medical that on and as of the Effective Date and continuously throughout any Term of this Agreement:

(i) it is a duly organized and existing limited liability company under the laws of the state of Delaware (Phonak) and it is a duly organized and existing corporation under the laws of the state of Minnesota (Unitron);

(ii)     it is duly authorized to enter into, deliver and perform this Agreement and the transactions contemplated hereunder;

(iii)     this Agreement constitutes a valid and binding obligation of Supplier, enforceable in accordance with its terms, except as the same may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to the enforcement of creditors' rights generally or by principles governing the availability of equitable remedies; and

(iv)     the execution and delivery of, its performance under, and its consummation of the transactions contemplated by, this Agreement do not and will not conflict with or violate any provision of its organizational documents or any agreement to which it is a party.

7.03     *Force Majeure.* Supplier shall not be liable for any failure or delays in its performance hereunder due to acts of God, acts of civil or military authority, fire, strikes, floods, epidemics, quarantine restrictions, war, riot, or other similar causes beyond its reasonable control. In the event of such delays, the date of delivery shall be extended for a period equal to the time lost by reason of the delay.

7.04     *Confidentiality.*

A.     All information, data, communication and other materials, whether of tangible or intangible form, regarding the party disclosing the same (the **"Disclosing Party"**) or any subsidiary, Affiliate, customer or supplier thereof, or otherwise identified by the Disclosing Party as sensitive or confidential to the party receiving the same (the **"Receiving Party"**) is **"Confidential Information"** and shall be protected under this Section 7.04. The parties stipulate and agree that existence of and contents of this Agreement and all attachments and documents incorporated into this Agreement, and any modifications thereof (specifically including all information relating to the pricing of Supplier Products but specifically excluding the identities of the Network Members), shall be deemed to be Confidential Information.

B.     So long as this Agreement is in effect and for a period of three (3) years following its termination or expiration, each of the parties agrees:

(i)     to limit access to the Confidential Information of the other party to those of its employees who reasonably require access thereto in order to effectuate this Agreement;

(ii)     not to use or disclose the Confidential Information except to fulfill its obligations under this Agreement;

(iii)     not to make available or disclose the Confidential Information of the Disclosing Party without the prior written consent of the Disclosing Party; and

(iv)     to take all reasonable precautions to maintain the confidentiality of the Confidential Information of the Disclosing Party, employing at least those commercially reasonable precautions which the Receiving Party employs to protect its own information of a similar nature.

C.     This confidentiality obligation does not apply to Confidential Information:

(i)     which has become generally available to the public (without a violation of this Agreement by the Receiving Party);

9

        (ii)      becomes available to the Receiving Party on a non-confidential basis from a source other than Providing Party, *provided* that such source is not known, after due inquiry, by the Receiving Party to be bound by a confidentiality agreement with, or other obligation of secrecy to, the Providing Party or any other person;;

        (iii)     was in the Receiving Party's possession prior to the receipt from the Providing Party, *provided* that the source of such information was not known, after due inquiry, by such Receiving Party to be bound by a confidentiality agreement with, or other obligation of secrecy to, Providing Party or any other person in respect thereof;

        (iv)     is independently developed by the Receiving Party without use of Providing Party's Confidential Information.

D.      The Receiving Party has the burden of proving the applicability of the foregoing exemptions with written documentation.

E.      Upon any termination or expiration of this Agreement, or earlier at the Disclosing Party's request each the Receiving Party shall return to the Disclosing Party all Confidential Information (including all copies) received from the Disclosing Party and take all reasonable steps to remove or delete such Confidential Information from the Receiving Party's computers and computer programs.

F.      If the Receiving Party is required by a court or administrative body of competent jurisdiction to disclose Confidential Information of the Disclosing Party, the Receiving Party agrees to (i) provide prompt notice to the Disclosing Party and (ii) take all reasonable legal means to resist such disclosure. If such disclosure cannot be legally resisted, the Receiving Party agrees to make reasonable efforts to obtain a protective order for the Confidential Information of the Disclosing Party, which must be disclosed. Both the determination as to whether resistance to disclosure is legal and the efforts to protect information will be at the Disclosing Party's expense; provided that the Disclosing Party approves all such expenses in writing in advance of the Receiving Party's incurring the same.

G.      Each of the parties hereto acknowledges and agrees that in the event of a violation of the provision of this Section 7.04, the aggrieved party cannot be fully or adequately compensated in damages and that, in addition to any other relief to which the aggrieved party is entitled, it shall be entitled to temporary and permanent injunctive and equitable relief without the need to post a bond or other security.

7.05    *Use of Trademarks.*

A.      Supplier grants to Fuel Medical and the Network Members a non-exclusive, revocable, non-transferable, royalty free, limited license to reproduce, use, copy, distribute and display Supplier's Trademarks during the term of this Agreement. Except as expressly provided in this Agreement, no right, property, license, permission or interest of any kind in, or the use of any trademark, trade name, color combination, insignia, logo, or device (the "Trademarks") owned or used by Supplier or any affiliate of Supplier is or is intended to be given or transferred to or acquired by Fuel Medical or any Network Member by the execution, performance or nonperformance of this Agreement or any party thereof. Except as expressly provided in this Agreement, the use of the Supplier's Trademarks shall be for the sole purpose of this Agreement and the right to use the Supplier's Trademarks shall terminate upon the termination of this Agreement. All uses of Supplier's Trademarks and any benefit or goodwill related thereto, shall inure solely to Supplier. Supplier shall have approval rights over Fuel Medical's and each Network Member's use, display, distribution or publication of Supplier's Trademarks, and neither Fuel Medical nor any Network Member may use Supplier's Trademarks in any manner whatsoever without first obtaining the prior written approval of Supplier, except that Fuel Medical and any Network Member

may use any advertising materials produced by either hereunder and owned by Supplier for Fuel Medical's or Network Member's creative reel or portfolio, and for criticism and commentary purposes whether in digital form or any other form now known or hereafter developed. Each party represents and warrants to the other that it has the right and power to carry out the intention and obligations of this paragraph.

C. Fuel Medical and the Network Members recognize that it is of paramount importance that their respective licensed use of Supplier's Trademarks be made in such a way that the high quality of the image, reputation and good will associated with the respective licensor and the licensed marks be protected and maintained at all times. Fuel Medical and the Network Members agree that their use of the Trademarks will be in a manner consistent with Supplier's usual standards of high quality, style and image utilized in connections with Supplier's product, services, and marketing, advertising and promotional materials. All materials produced by or for Fuel Medical and the Network Members using the Trademarks shall be subject to prepublication review and written approval by Supplier. Fuel Medical and the Network Members shall obtain Supplier's prior written approval for all creative and media materials incorporating the Trademarks (including, without limitation, broadcast, fax, placement on a web site, yellow pages or any other advertising or marketing medium). Fuel Medical and the Network Members shall submit samples of all proposed materials incorporating the Trademarks for Supplier's approval. Supplier shall notify Fuel Medical within seven (7) business days of submission of the materials whether approval is granted or withheld. Any materials not disapproved within such seven (7) business days shall be deemed approved. When media deadlines dictate a response in fewer than seven (7) business days, Supplier will make every reasonable effort to approve the materials within the timeframe provided by Fuel Medical and the Network Members. In no event shall Fuel Medical advertise the Supplier Products or use any of the Trademarks in such manner, or engage in any act or practice, that is likely to deceive or mislead consumers, or which Supplier may reasonably find injurious to its business reputation or goodwill.

D. Fuel Medical shall not use or register the name "Supplier," any of the Trademarks, or any other word or device likely to be confused therewith, as a trademark or a trade name, whether by themselves or in connection with the name Fuel Medical or the name of any of its affiliates. In the event that Fuel Medical and/or the Network Members are deemed to have any rights, title or interest in the Trademarks, Fuel Medical and/or the Network Members shall promptly, upon request, execute and deliver to Supplier all documents that Supplier deems necessary or desirable to assign and transfer to Supplier all of Fuel Medical and/or the Network Members' right, title and interest, if any, in the Trademarks and any other trademarks owned by Supplier, together with all goodwill associated therewith.

E. Fuel Medical shall not acquire any ownership rights to the Trademarks, and/or any goodwill, trade name, trademark, service mark, copyright, patent, trade secret or other similar property, including applications related thereto, of Supplier or any of its affiliates by virtue of this Agreement, which rights shall remain the property of Supplier or such affiliate. Fuel Medical and the Network Members shall not alter or remove any of the Trademarks applied to the Supplier Products without the prior written approval of Supplier.

F. Upon a termination of this Agreement, Fuel Medical shall immediately cease from all further use of the name "Supplier" and the Trademarks.

7.06 *Governing Law and Jurisdiction.* This Agreement is governed by the laws of the State of Delaware, without regard to, or application of, its laws relating to conflicts of law. Each party to this Agreement agrees that any suit, action or proceeding, whether claim or counterclaim, brought or instituted by any party hereto or any successor or assign of any party, on or with respect to this Agreement or the dealings of the parties with respect hereto, shall be tried only by a court and not by a jury. EACH

11

PARTY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH SUIT, ACTION OR PROCEEDING. Further, each party waives any right it may have to claim or recover, in any such suit, action or proceeding, any special, exemplary, punitive or consequential damages or any damages other than, or in addition to, actual damages. EACH PARTY ACKNOWLEDGES AND AGREES THAT THIS PARAGRAPH IS A SPECIFIC AND MATERIAL ASPECT OF THIS AGREEMENT AND THAT NEITHER PARTY WOULD HAVE ENTERED INTO THIS AGREEMENT IF THE WAIVERS SET FORTH IN THIS PARAGRAPH WERE NOT A PART OF THIS AGREEMENT. THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS IN ANY WAY, MANNER OR RESPECT, ARISING OUT OF OR FROM OR RELATED TO THIS AGREEMENT WILL BE LITIGATED ONLY IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON. THE PARTIES HEREBY CONSENT AND SUBMIT TO THE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON. EACH PARTY WAIVES ANY RIGHT IT MAY HAVE TO TRANSFER OR CHANGE VENUE OF ANY SUIT BROUGHT AGAINST IT BY THE OTHER IN ACCORDANCE WITH THIS SECTION.

7.07 *Amendments; Assignment; Waivers; Change of Control.* Nothing in this Agreement shall be construed as requiring the consent of any of the Network Members to any modification or amendment of this Agreement. Modifications or amendments to this Agreement are effective only if in writing and signed by the parties. The terms hereof may be waived, only by a written instrument signed by the party waiving compliance. No delay on the part of any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof. No waiver on the part of any party of any right, power or privilege, nor any single or partial exercise of any such right, power or privilege, shall preclude any further exercise thereof or the exercise of any other such right, power or privilege. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. Neither this Agreement, nor any right hereunder, may be assigned without the prior written consent of the other party; provided; however that either party may assign its rights and obligations under this Agreement without the other party's consent solely in connection with a Change of Control of the assigning party or an assigning party's Affiliate, including Supplier. A Change of Control shall be deemed to be an assignment for purposes of this Agreement.

7.08 *Severability.* If a court finds any part of this Agreement to be unenforceable, that part will be enforced to the extent permissible so as to carry out the intent of the parties and the remainder of this Agreement shall continue in full force and effect.

7.09 *Notices.* Except as otherwise set forth in this Agreement, all notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third business day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the addresses set forth above (or at such other address for a party as shall be specified in a notice given in accordance with this Section 7.09) and to Supplier as follows:

| If to Phonak: | 4520 Weaver Parkway<br>Warrenville, IL 60555<br>Attn: Rose Bongiovanni, VP Strategic Accounts |
| --- | --- |
| With a copy to: | Legal Department |

12

|                 | 4520 Weaver Parkway            |
|-----------------|--------------------------------|
|                 | Warrenville, IL 60555          |
|                 | Attn: General Counsel          |
| If to Unitron:  | 14755 27th Ave N    |

If to Unitron: 14755 27th Ave N
Plymouth, MN 55447
Attn: Robert Eastman, VP Sales

With a copy to: Legal Department
4520 Weaver Parkway
Warrenville, IL 60555
Attn: General Counsel

7.10   *Relationship of Parties.*   The parties to this Agreement are independent contractors, and nothing in this Agreement is intended to create any relationship of partnership, joint venture, employment, franchise, or agency relationship between the parties. The parties and Supplier are in no way authorized to make any contract, agreement, representation or warranty on behalf of the other.

7.11   *Counterparts.*   This Agreement may be executed in counterparts, each of which shall be deemed an original, but which together shall constitute one instrument. Counterparts may be executed and delivered by facsimile or other electronic means of transmission, and upon receipt, such electronic transmission shall be deemed delivery of an original.

7.12   *Survival.*   The rights and obligations of the parties as set forth in the following provisions shall survive the termination of this Agreement: Sections, 6.01, 6.02, 7.04, 7.05, 7.06, 7.09, 7.12, 7.16, 7.17, 7.18 and 7.20.

7.13   *Headings and Titles.*   The headings and titles of this Agreement are inserted for convenience only and shall not he deemed a part hereof or affect the construction or interpretation of any provision hereof.

7.14   *Third Party Beneficiaries.*   Except as specifically set forth herein with respect to Network Members, nothing in this Agreement is intended or shall be construed to give any person or entity not a party hereto any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision contained herein.

7.15   *Entire Agreement.*   This Agreement (together with the Schedules and Exhibits hereto) constitutes the entire agreement between the parties relating to the subject matter hereof and replaces and supersedes any and all prior agreements and understandings.

7.16   *Supplier Indemnification.*   Fuel Medical shall promptly inform Supplier of any alleged infringement of patent or product liability by a third party, and provide any available evidence thereof and Supplier shall be afforded the opportunity to determine the manner in which such action or suit shall be handled or otherwise disposed of. During the term of this Agreement, except to the extent of Fuel Medical's or a Network Member's negligence or willful misconduct and subject to the terms of Supplier's limited warranty as set forth in Section 6.01 above, Supplier agrees to indemnify, defend and hold harmless Fuel Medical, and its successors, assigns, directors, officers, employees, customers, and agents from and against any actual loss, damage, liability, cost or expense (including attorneys' fees and costs) actually sustained by an Indemnified Party as a direct result of a patent infringement or product liability claim with respect to a Supplier Product.

7.17    *Fuel Medical Indemnity.*  During the term of this Agreement, except to the extent of Supplier's negligence or willful misconduct, Fuel Medical agrees to indemnify, defend and hold harmless Supplier, its Affiliates and each of their respective successors, assigns, directors, officers, employees, agents, attorneys and representatives from and against any loss, damage, liability, cost or expense (including reasonable attorneys' fees) arising out of a breach of, or failure to perform under, this Agreement by Fuel Medical.

7.18    *Compliance.*  Fuel Medical shall comply with all federal and state laws and regulations that are applicable to its business including, without limitation, all laws and regulations specifically applicable to the sale and distribution of hearing devices.  Fuel Medical shall promptly report any known violation of this Section by a Network Member to Supplier.

7.19    *Prohibited Conduct.*  Fuel Medical will not knowingly or willfully engage in conduct that Supplier considers harmful to its reputation, the Supplier Products, or that of an Affiliate. Fuel Medical will use their best efforts to maintain and enhance the name, reputation and good will of Supplier and the Supplier Products.

7.20    *Limitation of Liability.*  Notwithstanding anything to the contrary set forth herein, in no event shall either party hereto be entitled to punitive, consequential or speculative damages, including damages for lost profits. Phonak and Unitron shall not, in any way, be jointly and/or severally liable for the other's indemnification and other respective obligations under this Agreement.

7.21    *Principles of Construction.*  Each party has been represented, or has had the opportunity to be represented, by its own counsel in connection with this Agreement, and the parties agree that they have jointly drafted this Agreement.

7.22    *Remuneration.*

(a)    Fair Market Value.  Remuneration flowing between the parties hereunder is at fair market value for actual and necessary items furnished or services rendered, is based upon an arm's-length transaction, and does not take into account, directly or indirectly, the value or volume of any past or future referral or other business generated between the parties hereto (or of any referral or business of any principal, affiliate, or immediate family member — as those terms may be defined by applicable laws — of either party hereto). The parties agree that it is not their intent that any payments made under this Agreement be in return for the purchasing or ordering of any products or services other than the specific Supplier Products or services described in this Agreement.

(b)    Discounts.  For any purchases made under applicable law (42 U.S.C. § 1320a-7b(b)(3)(A)), any discount, rebate, and other price reduction (collectively referred to herein as "Discounts") given by Supplier to any Network Member under this Agreement constitutes a discount. Supplier's invoice will detail the Discounts and the allocation of net purchase dollars appearing on that invoice. Fuel Medical and Network Member will report discounts and provide information as required under 42 C.F.R. § 1001.952(h), only as required for specifically applicable products (i.e. for covered services).

(c)    Sunshine Act.  Supplier warrants that it has not and will not provide anything under this Agreement that requires reporting under the Physician Payments Sunshine Act.

7.23    *Negotiation.*  Each party to this Agreement represents that it has been counseled independently by its attorneys concerning the meaning and legal effect of the terms of this Agreement. After such

counseling, each party represents that it fully understands this Agreement and its terms, and, with this full understanding, voluntarily enters into this Agreement as evidenced by signing it below. Each party to this Agreement further represents that it has executed this document based on its own knowledge and its own investigation of the facts, and that it has not executed this document in reliance upon any statement or omission of any person connected with, representing or represented by the other party to this Agreement.

[Signature page follows]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

**FUEL MEDICAL GROUP, LLC**

By: _____
Brendan Ford
Its: Founder

By: _____
Shawn Parker
Its: Founder

**PHONAK, LLC**

By: _____
Jan Metzdorff, its President

By: _____
JD D'Elia, its VP - Finance

**UNITRON HEARING, INC.**

By: _____
Jan Metzdorff, Managing Director -
Hearing Instrument Wholesale US

By: _____
Mike Dittmann, its President

# EXHIBIT A

## SUPPLIER PUBLISHED SALES POLICIES

Attached

# EXHIBIT B
## MANUFACTURER RELEASE FORM



## EXHIBIT A

**To Whom It May Concern:**

I hereby authorize my accounts to be affiliated with Fuel Medical Group. I have granted the Officers of Fuel Medical Group access to account management information on my behalf. Please provide to them at their request whatever information they may require to administer our relationship, including but not limited to (1) duplicates of invoices, (2) refund and exchange confirmations and (3) account summaries.

These arrangements should remain in effect for all of my orders unless and until you receive written notification from me. Please contact me at if you require any additional authorization.

**With best regards,**

Signature _____          Primary (Bill-To) Address:

Name: _____               _____

Title: _____               _____

Practice Name: _____

Phone Number: _____          _____

Email: _____               _____

Additional (Ship-To) Addresses:               Additional (Ship-To) Addresses:

_____               _____

_____               _____

Additional (Ship-To) Addresses:               Additional (Ship-To) Addresses:

_____               _____

_____               _____

_____               _____

**Fax back to 360.216.0339**

314 NE Birch Street • Camas, WA 98607 • 360.210.5658 • www.fuelmedical.com

# EXHIBIT B

# FIRST AMENDMENT
## TO
## SUPPLY AGREEMENT

THIS FIRST AMENDMENT ("First Amendment") to the Supply Agreement (as defined below) is made effective as of March 1, 2017 (the "Effective Date") by and among between Sonova USA Inc., a Minnesota corporation, ("**Sonova USA**"), with a principal place of business located at 4520 Weaver Parkway, Warrenville, IL 60555, and Fuel Medical Group, LLC, a Washington limited liability company ("Fuel Medical") with a principal place of business located at 314 NE Birch St, Camas, WA 98607.

## RECITALS

A. **WHEREAS**, Phonak, LLC, Unitron Hearing, Inc., and Fuel Medical entered into that certain Supply Agreement dated March 1, 2017 (the "Agreement").

B. **WHEREAS**, Sonova USA Inc. is the successor-in-interest to Phonak, LLC.

C. **WHEREAS,** Unitron Hearing, Inc. merged into Sonova USA Inc.

D. **WHEREAS**, Sonova USA Inc. and Fuel Medical now desire to amend certain terms of the Initial Agreement as set forth herein.

**NOW THEREFORE**, in consideration of the foregoing recitals, which are hereby incorporated and made a part of this First Amendment, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, hereby agree as follows:

## AGREEMENT

1. Section 3.01 shall now be amended to state:

1.01   *Network Members*.   Any Person shall be a Network Member under this Agreement by and upon such Person's execution of a Manufacturer Release Form (attached as Exhibit B), written notification to Supplier from Fuel Medical of such Person's Fuel Medical Network membership, and upon a satisfactory credit report obtained by Supplier and credit approval by Supplier which such satisfactory nature and approval shall be in Supplier's sole and absolute discretion. Fuel Medical acknowledges and agrees that Supplier shall have the right, in its reasonable discretion to elect not to do business with any Network Member under this Agreement or decline to accept any specific order from any Network Member.  Fuel Medical shall promptly notify Supplier if any Network Member shall cease to be a member in good standing.  In the event Supplier is notified by Network Member of a change in its Fuel association, Supplier shall promptly notify Fuel if any Network Member requests the removal of the Fuel Medical association from their account with Supplier and Supplier shall advise Network Member of its contractual requirement with Fuel to notify Fuel directly of such changes. Fuel understands and agrees that Supplier may need up to 30 days for this request to go into effect, in order to provide sufficient time for the account transfer.

2. Except as provided in this First Amendment, all terms used, but not otherwise defined, herein shall have the respective meanings ascribed to such terms in the Agreement.

3. Except as specifically modified and amended in this First Amendment, all of the terms, provisions, requirements and specifications contained in the Agreement remain in full force and effect.

DocuSign Envelope ID: 5828BCC7-FB29-4EB6-9129-51F0D59C025C

4.  This First Amendment may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same agreement. Counterparts may be executed and delivered by facsimile or other electronic means of transmission, and upon receipt such transmission shall be deemed delivery of an original.

[Signature page follows]

**IN WITNESS WHEREOF**, the duly-authorized representatives of the parties hereto have executed this First Amendment to Supply Agreement as of the Effective Date.

**SONOVA USA INC.**

By: _____
Jason Mayer
89505DB257B64EE...

Print name: Jason Mayer

Title: VP Sales

By: _____
Kevin Schulhof
7B48DBA5C7094C4...

Print name: Kevin Schulhof

Title: VP Finance

**FUEL MEDICAL GROUP, LLC**

By: _____
Brendan Ford
2FD734EA0FB24DE...

Print name: Brendan Ford

Title: Founder

# EXHIBIT C

# NON-DISCLOSURE AGREEMENT

THIS NON-DISCLOSURE AGREEMENT (the "NDA") is dated as of January 30, 2018 (the "Effective Date"), by and between Sonova USA Inc., with its principal place of business located 4520 Weaver Parkway, Warrenville, Illinois 60555 ("Sonova") and Fuel Medical Group, LLC, with its principal place of business located at 314 NE Birch St., Camas, WA 98607 (the "Recipient"). The term "Providing Party" refers to the party providing information, and the term "Receiving Party" refers to the party receiving information. For good and valuable consideration, the sufficiency of which is hereby acknowledged, the parties agree as follows:

**1.    Information: Representatives.**  Sonova and the Recipient are interested in discussing Sonova's product development cycle concerning the Phonak brand, including new products and accessories and related features and software as well as Recipient's go to market strategies and marketing tactics with its Fuel Members (collectively, the "Transaction"). Each Providing Party is prepared to make available and/or has made available to the Receiving Party certain Information (as defined below) in connection with the Transaction. As a condition to the Information being furnished, each Receiving Party agrees to treat the Providing Party's Information in accordance with the provisions of this NDA and to take or abstain from taking certain other actions as set for the below. As used herein, "Information," with respect to a Providing Party, means confidential, non-public or proprietary information concerning such Providing Party's business, operations, finances, sales, marketing, customers, products or technologies, including, without limitation, patents, ideas, know-how, trade secrets, technical information, research and development, software (including both object and source code), strategic plans, products, devices, pricing, specifications, processes, data, formulae, compositions, designs, sketches, photographs, graphs and drawings, and all copies, reproductions, notes, extracts, compilations and repositories thereof created by either party, in each case whether in written, verbal, electronic or any other form and whether transmitted or created before, on or after the date hereof, as well as any discussions which take place between the parties hereunder and the terms of any Transaction being evaluated by the parties in connection with this NDA. As used herein, the "Representatives" of a party shall mean the directors, officers, employees, representatives, agents, attorneys, consultants, accountants, financial advisors and other advisors of such party and its affiliates, respectively, with whom a Receiving Party shares Information. The term "person" shall be interpreted broadly to include, without limitation, any corporation, company, group, partnership, other entity or individual.

**2.    Excluded Information.**  This NDA shall not apply to Information that: (a) becomes generally available to the public through no breach of this NDA by the Receiving Party or its Representatives; (b) becomes available to the Receiving Party on a non-confidential basis from a source other than Providing Party or its Representatives, *provided* that such source is not known, after due inquiry, by the Receiving Party or its Representatives to be bound by a confidentiality agreement with, or other obligation of secrecy to, the Providing Party or any other person; (c) was in the Receiving Party's possession prior to the receipt from the Providing Party, *provided* that the source of

such information was not known, after due inquiry, by such Receiving Party to be bound by a confidentiality agreement with, or other obligation of secrecy to, Providing Party or any other person in respect thereof; or (d) is independently developed by the Receiving Party without use of Providing Party's Information. The Receiving Party has the burden of proving the applicability of the foregoing exemptions with written documentation.

**3.     Non-Disclosure of Information.** The Receiving Party shall use Providing Party's Information solely for the purpose of evaluating, negotiating or participating in the Transaction with Providing Party or its affiliates. The Receiving Party shall keep Providing Party's Information confidential and shall not, directly or indirectly, disclose any of Providing Party's Information in any manner whatsoever; *provided, however,* that the Receiving Party may disclose such Information to the Receiving Party's Representatives who have a need to know such Information for the purposes of the Transaction between the parties and who agree to keep such Information confidential and to comply with the terms of this NDA. The Receiving Party agrees that a breach of this NDA by any of its Representatives shall constitute a breach by such Receiving Party.

**4.     Required Disclosure.** If a Receiving Party or anyone to whom it discloses Providing Party's Information receives a request or is required to disclose all or any part of Providing Party's Information by law, regulation or legal process, such Receiving Party: (a) shall to the extent permitted by law, promptly notify the Providing Party of the existence, terms and circumstances surrounding such a request; (b) if disclosure of such Information is required, may, without liability hereunder, furnish only such portion of such Information as such Receiving Party is advised by counsel is legally required to be disclosed; and (c) shall cooperate with Providing Party, at Providing Party's expense, in its efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to that portion of such Information that is required to be disclosed.

**5.     Return of Information.** If either party determines not to proceed with the Transaction, it will promptly notify the other party of such decision. In that case, or at any time at the request of a Providing Party, the Receiving Party shall promptly return to such Providing Party or destroy all of such Providing Party's Information made available to such Receiving Party or its Representatives, including all copies, reproductions, notes, extracts, compilations and repositories thereof; *provided* that: (a) such Receiving Party and its Representatives may retain such Information to the extent required by law; and (b) neither party nor any of its Representatives will be required to erase electronically stored Information that has been saved to a back-up file in accordance with ordinary electronic back-up practices, on the condition that, except as otherwise required by applicable law or regulation: (i) personnel whose functions are not primarily information technology do not access such retained copies; and (ii) personnel whose functions are primarily information technology in nature access such copies only as reasonably necessary for the performance of their information technology duties (e.g., for purposes of system recovery). Notwithstanding the return, destruction or retention of Information (including orally communicated Information), all parties and

their respective Representatives will continue to be bound by the obligations of confidentiality and other obligations hereunder.

**6.    Disclaimer of Warranty.** Neither party has made or makes any representations or warranties regarding the accuracy or completeness of its Information, including without limitation any information relating to the assets, liabilities, results of operations, condition (financial or otherwise), customers, franchisees, suppliers or employees of such party. Each party agrees that neither the other party nor its Representatives shall have any liability to such party or any of its Representatives resulting from such party's use of such other party's Information, except as may be expressly set forth in a definitive written agreement between the parties with respect to a Transaction.

**7.    Relationship Between the Parties.** Nothing in this NDA shall obligate either party to enter into any Transaction and this NDA shall not be construed as creating, nor shall it create, a partnership, joint venture or agency relationship between the parties. Each party reserves the right, in its sole discretion, to reject any and all proposals made by the other party or its Representatives with regard to the Transaction and to terminate discussions and negotiations at any time and for any or no reason.

**8.    Specific Performance.** Each party acknowledges that money damages would not be a sufficient remedy for any breach of this NDA and that each party shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach by the other party or its Representatives, and each party and its Representatives further agrees to waive any requirement for the securing or posting of any bond or other security in connection with such remedy. Such remedy shall not be deemed to be the exclusive remedy for breach of this NDA, but shall be in addition to all other remedies available at law or equity.

**9.    Term.** This NDA shall commence on the Effective Date and shall continue until terminated by either party upon thirty (30) days' notice to the non-terminating party. The non-disclosure obligations of the Receiving Party herein shall remain in effect for a period of two (2) years from the termination of this NDA by either party.

**10.    Notices.** Notices to the parties shall be deemed to have been duly given if sent by overnight delivery to the appropriate address set forth in the introductory paragraph of this NDA or to such other address as may be given in a notice sent to all parties.

**11.    Miscellaneous.** This NDA constitutes the entire agreement between the parties and supersedes all prior oral or written agreements with respect to the subject matter and shall be governed in all respects by the laws of the State of Illinois, without giving effect to Illinois principles or rules of conflict of laws to the extent such principles or rules would require or permit the application of the laws of another jurisdiction. The parties hereby submit to the jurisdiction of the Illinois federal and state courts located in the County of DuPage for resolution of any disputes arising out of this NDA. The terms of this NDA shall apply to, be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. No party may assign this NDA without the prior written consent of the other party. In case any provision of this NDA shall be

invalid, illegal or unenforceable, it shall to the extent practicable, be modified so as to make it valid, legal and enforceable and to retain as nearly as practicable the intent of the parties, and the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired. This NDA may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument and may be executed by facsimile or other electronic transmission. No amendment of any provision of this NDA shall be valid unless the amendment is in writing and signed by both parties. No waiver of any provision of this NDA shall be valid unless the waiver is in writing and signed by the waiving party. No waiver by either party of any breach of this NDA shall be deemed to extend to any other breach hereunder or affect in any way any rights arising by virtue of any other such occurrence.

**IN WITNESS WHEREOF,** the parties hereto have executed this NDA as of the Effective Date.

| Sonova USA Inc. | Fuel Medical Group, LLC. |
|---|---|
| By: | By: |
| Name: Ian Metzdorff | Name: Brendan Ford |
| Title: President | Title: Founder |
| | |
| By: | |
| Name: JASON MAYER | |
| Title: VP SALES | |

# GROUP

# EXHIBIT D

## <u>AMENDMENT NO. 1 TO SUPPLY AGREEMENT</u>

This is the Amendment No. 1 ("Amendment") to the Supply Agreement ("Existing Agreement") that was executed effective March 1, 2017, by and among Phonak, LLC ("Phonak"), Unitron Hearing, Inc. ("Unitron"), and Fuel Medical Group, LLC ("Fuel Medical"). This Amendment is entered into by Fuel Medical and Sonova USA, Inc. ("Sonova USA" or "Supplier").

WHEREAS, Phonak, Unitron, and Fuel Medical entered into the Existing Agreement;

WHEREAS, the rights, obligations, and terms of the Existing Agreement applicable to Phonak and Unitron were assigned from Phonak and Unitron to Sonova USA in connection with a Change of Control in accordance with Section 7.07 of the Existing Agreement;

WHEREAS, the Initial Term of the Existing Agreement expired on February 29, 2020, the first Renewal Term expired on February 28, 2021, and the second Renewal Term is scheduled to expire on February 28, 2022;

WHEREAS, the parties hereto desire to amend the Existing Agreement to acknowledge the above-referenced assignment and to extend the second Renewal Term until March 31, 2022, but otherwise leave the Existing Agreement intact; and

WHEREAS, pursuant to Section 7.07 of the Existing Agreement, the amendment contemplated by the parties must be contained in a written agreement signed by the parties;

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

### AMENDMENT TERMS

1.      **<u>Assignment from Phonak and Unitron to Sonova USA</u>**.  The parties agree and acknowledge that the rights, obligations, and terms of the Existing Agreement applicable to Phonak and Unitron were assigned from Phonak and Unitron to Sonova USA in connection with a Change of Control in accordance with Section 7.07 of the Existing Agreement.

2.      **<u>Extension of Second Renewal Term</u>**.  The parties agree to extend the second Renewal Term from February 28, 2022 to March 31, 2022.

3.      **<u>Definitions</u>**. Capitalized terms used and not defined in this Amendment have the respective meanings assigned to them in the Existing Agreement.

4.      **<u>Date of Effectiveness; Limited Effect</u>**. This Amendment will be deemed effective as of the date on which both parties have executed this Amendment (the

"Effective Date"). Except as expressly provided in this Amendment, all of the terms and provisions of the Existing Agreement are and will remain in full force and effect and are hereby ratified and confirmed by the parties. Without limiting the generality of the foregoing, the amendments contained herein will not be construed as an amendment to or waiver of any other provision of the Existing Agreement or as a waiver of or consent to any further or future action on the part of either party that would require the waiver or consent of the other Party. On and after the Effective Date, each reference in the Existing Agreement to "this Agreement," "the Agreement," "hereunder," "hereof," "herein," or words of like import, and each reference to the Existing Agreement in any other agreements, documents, or instruments executed and delivered pursuant to, or in connection with, the Existing Agreement will mean and be a reference to the Existing Agreement as amended by this Amendment.

5. **Miscellaneous**.

   a. This Amendment is governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflict of laws provisions of such State.

   b. This Amendment constitutes the sole and entire agreement between the Parties with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

[SIGNATURES ON NEXT PAGE]

IN WITNESS WHEREOF, the parties hereto knowingly and voluntarily executed this Amendment as of the Effective Date:

**Fuel Medical Group, LLC**

Signature: _Shawn Parker_
DocuSigned by:
1DC9F4C9CC364FA...

Printed Name: Shawn Parker

Title: Founder

Date: 2/28/2022

**Fuel Medical Group, LLC**

Signature: _Brendan Ford_
DocuSigned by:
2PD734EA0FB24DE...

Printed Name: Brendan Ford

Title: Founder

Date: 2/28/2022

**Sonova USA, Inc.**

Signature: _Jason Mayer_
DocuSigned by:
89505DB257B64EE...

Printed Name: Jason Mayer

Title: VP Sales

Date: 2/28/2022

**Sonova USA, Inc.**

Signature: _Daniel Lantry_
DocuSigned by:
1971671C920B461...

Printed Name: Daniel Lantry

Title: VP, Legal Affairs, North America

Date: 2/28/2022

## **AMENDMENT NO. 2 TO SUPPLY AGREEMENT**

This is the Amendment No. 2 ("Amendment") to the Supply Agreement ("Existing Agreement") that was executed effective March 1, 2017, by and among Phonak, LLC ("Phonak"), Unitron Hearing, Inc. ("Unitron"), and Fuel Medical Group, LLC ("Fuel Medical"). This Amendment is entered into by Fuel Medical and Sonova USA Inc. ("Sonova USA" or "Supplier").

WHEREAS, Phonak, Unitron, and Fuel Medical entered into the Existing Agreement;

WHEREAS, the rights, obligations, and terms of the Existing Agreement applicable to Phonak and Unitron were assigned from Phonak and Unitron to Sonova USA in connection with a Change of Control in accordance with Section 7.07 of the Existing Agreement;

WHEREAS, the Initial Term of the Existing Agreement expired on February 29, 2020, the first Renewal Term expired on February 28, 2021, and the second Renewal Term is scheduled to expire on February 28, 2022;

WHEREAS, the parties executed Amendment No. 1 to Supply Agreement to acknowledge the above-referenced assignment and to extend the second Renewal Term until March 31, 2022, but otherwise leave the Existing Agreement intact;

WHEREAS the parties hereto desire to amend the Existing Agreement to extend the second renewal term until April 30, 2022, but otherwise leave the Existing Agreement intact ; and

WHEREAS, pursuant to Section 7.07 of the Existing Agreement, the amendment contemplated by the parties must be contained in a written agreement signed by the parties;

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

### **AMENDMENT TERMS**

1.     **Extension of Second Renewal Term**.  The parties agree to extend the second Renewal Term from March 31, 2022 to April 30, 2022.

2.     **Definitions**. Capitalized terms used and not defined in this Amendment have the respective meanings assigned to them in the Existing Agreement.

3.     **Date of Effectiveness; Limited Effect**. This Amendment will be deemed effective as of the date on which both parties have executed this Amendment (the "Effective Date"). Except as expressly provided in this Amendment, all of the terms and provisions of the Existing Agreement are and will remain in full force and effect and are

DocuSign Envelope ID: A50CE7A7-B081-42C2-A4BA-35BAAA135FD1

hereby ratified and confirmed by the parties. Without limiting the generality of the foregoing, the amendments contained herein will not be construed as an amendment to or waiver of any other provision of the Existing Agreement or as a waiver of or consent to any further or future action on the part of either party that would require the waiver or consent of the other Party. On and after the Effective Date, each reference in the Existing Agreement to "this Agreement," "the Agreement," "hereunder," "hereof," "herein," or words of like import, and each reference to the Existing Agreement in any other agreements, documents, or instruments executed and delivered pursuant to, or in connection with, the Existing Agreement will mean and be a reference to the Existing Agreement as amended by this Amendment.

4. **<u>Miscellaneous</u>**.

    a.    This Amendment is governed by and construed in accordance with the laws of the State of Delaware, without regard to the conflict of laws provisions of such State.

    b.    This Amendment constitutes the sole and entire agreement between the Parties with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

[SIGNATURES ON NEXT PAGE]

DocuSign Envelope ID: A50CE7A7-B081-42C2-A4BA-35BAAA135FD1

IN WITNESS WHEREOF, the parties hereto knowingly and voluntarily executed this Amendment as of the Effective Date:

**Fuel Medical Group, LLC**

Signature: _Shawn Parker_

Printed Name: Shawn Parker

Title: Founder

Date: 3/28/2022

**Sonova USA Inc.**

Signature: _____

Printed Name: _____

Title: _____

Date: _____

**Fuel Medical Group, LLC**

Signature: _____

Printed Name: Brendan Ford

Title: Founder

Date: 3/28/2022

**Sonova USA Inc.**

Signature: _Daniel Lantry_

Printed Name: Daniel Lantry

Title: VP, Legal Affairs, North America

Date: 3/28/2022

## <u>AMENDMENT NO. 3 TO SUPPLY AGREEMENT</u>

This is Amendment No. 3 ("Amendment") to the Supply Agreement, effective March 1, 2017, as amended to date ("Existing Agreement"), by and between Sonova USA Inc. as successor in interest to Phonak, LLC  and Unitron Hearing, Inc. ("Sonova USA" or "Supplier") and Fuel Medical Group, LLC ("Fuel Medical"). This Amendment is effective as of April 29, 2022 ("Effective Date").

WHEREAS, the Initial Term of the Existing Agreement was scheduled to expire on February 29, 2020, and the Existing Agreement has been amended twice to extend the Term through April 30, 2022; and

WHEREAS the parties hereto desire to amend the Existing Agreement to further extend the Term through May 31, 2022, but otherwise leave the Existing Agreement intact.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

### AMENDMENT TERMS

1.      **Extension of Term**.  The parties agree to extend the Term of the Existing Agreement through May 31, 2022.

2.      **Definitions**. Capitalized terms used and not defined in this Amendment have the respective meanings assigned to them in the Existing Agreement.

3.      **Date of Effectiveness; Limited Effect**. This Amendment is effective as of the Effective Date. Except as expressly provided in this Amendment, all of the terms and provisions of the Existing Agreement are and will remain in full force and effect and are hereby ratified and confirmed by the parties.

### [SIGNATURES ON NEXT PAGE]

IN WITNESS WHEREOF, the parties hereto knowingly and voluntarily executed this Amendment as of the Effective Date:

**Fuel Medical Group, LLC**

Signature: _Brendan Ford_
2FD734EA0FB24DE...

Printed Name: Brendan Ford

Title: Founder

Date: 4/28/2022

**Fuel Medical Group, LLC**

Signature: _Shawn Parker_
1DC5F4C9CC384FA...

Printed Name: Shawn Parker

Title: Founder

Date: 4/28/2022

**Sonova USA, Inc.**

Signature: _Jason Mayer_
09505DB257D04EE...

Printed Name: Jason Mayer

Title: VP Sales

Date: 4/28/2022

**Sonova USA, Inc.**

Signature: _Daniel Lantry_
1971671C920B461...

Printed Name: Daniel Lantry

Title: VP, Legal Affairs, North America

Date: 4/28/2022

## AMENDMENT NO. 4 TO SUPPLY AGREEMENT

This is Amendment No. 4 ("Amendment") to the Supply Agreement, effective March 1, 2017, as amended to date ("Existing Agreement"), by and between Sonova USA Inc. as successor in interest to Phonak, LLC  and Unitron Hearing, Inc. ("Sonova USA" or "Supplier") and Fuel Medical Group, LLC ("Fuel Medical"). This Amendment is effective as of May 26, 2022 ("Effective Date").

WHEREAS, the Initial Term of the Existing Agreement was scheduled to expire on February 29, 2020, and the Existing Agreement has been amended three times to extend the Term through May 31, 2022; and

WHEREAS the parties hereto desire to amend the Existing Agreement to further extend the Initial Term through June 30, 2022, but otherwise leave the Existing Agreement intact.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## AMENDMENT TERMS

1.     **Extension of Term**.  The parties agree to further extend the Initial Term of the Existing Agreement through June 30, 2022. The parties agree that there shall be no Renewal Term of the Existing Agreement.

2.     **Definitions**. Capitalized terms used and not defined in this Amendment have the respective meanings assigned to them in the Existing Agreement.

3.     **Date of Effectiveness; Limited Effect**. This Amendment is effective as of the Effective Date. Except as expressly provided in this Amendment, all of the terms and provisions of the Existing Agreement are and will remain in full force and effect and are hereby ratified and confirmed by the parties.

**[SIGNATURES ON NEXT PAGE]**

IN WITNESS WHEREOF, the parties hereto knowingly and voluntarily executed this Amendment as of the Effective Date:

**Fuel Medical Group, LLC**

Signature: _Brendan Ford_
2FD734EA0FB24DE...

Printed Name: Brendan Ford

Title: Founder

Date: 5/26/2022

**Fuel Medical Group, LLC**

Signature: _Shawn Parker_
1DC5F4C8CC504FA...

Printed Name: Shawn Parker

Title: Founder

Date: 5/26/2022

**Sonova USA Inc.**

Signature: _Jason Mayer_
89505DB257B64EE...

Printed Name: Jason Mayer

Title: VP Sales

Date: 5/26/2022

**Sonova USA Inc.**

Signature: _Daniel Lantry_
197167TC92DB461...

Printed Name: Daniel Lantry

Title: VP, Legal Affairs, North America

Date: 5/26/2022

# <u>AMENDMENT NO. 5 TO SUPPLY AGREEMENT</u>

This is Amendment No. 5 to Supply Agreement ("Amendment") and amends that certain Supply Agreement, effective March 1, 2017, as amended to date ("Existing Agreement"), by and between Sonova USA Inc. as successor in interest to Phonak, LLC and Unitron Hearing, Inc. ("Sonova USA" or "Supplier") and Fuel Medical Group, LLC ("Fuel Medical"). This Amendment is effective as of June 29, 2022 ("Effective Date").

WHEREAS, the Initial Term of the Existing Agreement was scheduled to expire on February 29, 2020, and the Existing Agreement previously has been amended to extend the Initial Term through June 30, 2022; and

WHEREAS the parties hereto desire to amend the Existing Agreement to further extend the Initial Term through July 31, 2022, but otherwise leave the Existing Agreement intact.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## AMENDMENT TERMS

1.      **Extension of Initial Term**.  The parties agree to further extend the Initial Term of the Existing Agreement through July 31, 2022. The parties agree that there shall be no Renewal Term of the Existing Agreement.

2.      **Definitions**. Capitalized terms used and not defined in this Amendment have the respective meanings assigned to them in the Existing Agreement.

3.      **Date of Effectiveness; Limited Effect**. This Amendment is effective as of the Effective Date. Except as expressly provided in this Amendment, all of the terms and provisions of the Existing Agreement are and will remain in full force and effect and are hereby ratified and confirmed by the parties.

## [SIGNATURES ON NEXT PAGE]

IN WITNESS WHEREOF, the parties hereto knowingly and voluntarily executed this Amendment as of the Effective Date:

**Fuel Medical Group, LLC**

Signature: _Brendan Ford_
2FD734EA0FB24DE...

Printed Name: Brendan Ford

Title: Founder

Date: 6/29/2022

**Fuel Medical Group, LLC**

Signature: _Shawn Parker_
1DC5F4C9CC304FA...

Printed Name: Shawn Parker

Title: Founder

Date: 6/29/2022

**Sonova USA, Inc.**

Signature: _Jason Mayer_
895U5DB257B64EE...

Printed Name: Jason Mayer

Title: VP Sales

Date: 6/29/2022

**Sonova USA, Inc.**

Signature: _Daniel Lantry_
1074674C020D461...

Printed Name: Daniel Lantry

Title: VP, Legal Affairs, North America

Date: 6/29/2022

.

# AMENDMENT NO. 6 TO SUPPLY AGREEMENT

This is Amendment No. 6 to Supply Agreement ("Amendment") and amends that certain Supply Agreement, effective March 1, 2017, as amended to date ("Existing Agreement"), by and between Sonova USA Inc. as successor in interest to Phonak, LLC and Unitron Hearing, Inc. ("Sonova USA" or "Supplier") and Fuel Medical Group, LLC ("Fuel Medical"). This Amendment is effective as of July 28, 2022 ("Effective Date").

WHEREAS, the Initial Term of the Existing Agreement was scheduled to expire on February 29, 2020, and the Existing Agreement previously has been amended to extend the Initial Term through July 31, 2022; and

WHEREAS the parties hereto desire to amend the Existing Agreement to further extend the Initial Term through August 31, 2022, but otherwise leave the Existing Agreement intact.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## AMENDMENT TERMS

1. **Extension of Initial Term**.  The parties agree to further extend the Initial Term of the Existing Agreement through August 30, 2022. The parties agree that there shall be no Renewal Term of the Existing Agreement.

2. **Definitions**. Capitalized terms used and not defined in this Amendment have the respective meanings assigned to them in the Existing Agreement.

3. **Date of Effectiveness; Limited Effect**. This Amendment is effective as of the Effective Date. Except as expressly provided in this Amendment, all of the terms and provisions of the Existing Agreement are and will remain in full force and effect and are hereby ratified and confirmed by the parties.

**[SIGNATURES ON NEXT PAGE]**

IN WITNESS WHEREOF, the parties hereto knowingly and voluntarily executed this Amendment as of the Effective Date:

**Fuel Medical Group, LLC**

Signature: _Brendan Ford_

Printed Name: Brendan Ford

Title: Founder

Date: 7/29/2022

**Fuel Medical Group, LLC**

Signature: _Shawn Parker_

Printed Name: Shawn Parker

Title: Founder

Date: 7/29/2022

**Sonova USA Inc.**

Signature: _Jason Mayer_

Printed Name: Jason Mayer

Title: VP Sales

Date: 7/28/2022

**Sonova USA Inc.**

Signature: _Daniel Lantry_

Printed Name: Daniel Lantry

Title: VP, Legal Affairs, North America

Date: 7/29/2022

# GROUP
# EXHIBIT E

## AMENDMENT NO. 7 TO SUPPLY AGREEMENT

This is Amendment No. 7 to Supply Agreement ("Amendment") and amends that certain Supply Agreement, effective March 1, 2017, as amended to date ("Existing Agreement"), by and between Sonova USA Inc. as successor in interest to Phonak, LLC and Unitron Hearing, Inc. ("Sonova USA" or "Supplier") and Fuel Medical Group, LLC ("Fuel Medical"). Sonova USA and Fuel Medical are referred to collectively herein as "the Parties." This Amendment is effective as of August 31, 2022 ("Effective Date").

WHEREAS, the Existing Agreement has been amended to extend the Term through August 31, 2022; and

WHEREAS, the Parties hereto desire to amend the Existing Agreement to further extend the Term through September 7, 2022, but otherwise leave the Existing Agreement intact.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### AMENDMENT TERMS

1.     **Extension of Term**.  The Parties agree to further extend the Term of the Existing Agreement through September 7, 2022.

2.     **Definitions**. Capitalized terms used and not defined in this Amendment have the respective meanings assigned to them in the Existing Agreement.

3.     **Date of Effectiveness; Limited Effect**. This Amendment is effective as of the Effective Date. Except as expressly provided in this Amendment, all of the terms and provisions of the Existing Agreement are and will remain in full force and effect and are hereby ratified and confirmed by the parties.

### [SIGNATURES ON NEXT PAGE]

IN WITNESS WHEREOF, the parties hereto knowingly and voluntarily executed this Amendment as of the Effective Date:

**Fuel Medical Group, LLC**

Signature: _____

Printed Name: _____

Title: _____

Date: _____

**Fuel Medical Group, LLC**

Signature: _____

Printed Name: Brendan Ford

Title: Founder

Date: 8/31/2022

**Sonova USA Inc.**

Signature: _____

Printed Name: Daniel Lantry

Title: VP, Legal Affairs, NA

Date: 8/31/22

**Sonova USA Inc.**

Signature: _____

Printed Name: Shawn Parker

Title: Founder

Date: 8/31/2022

2

DocuSign Envelope ID: 64C7A37E-9A6D-4DB5-BE46-0200DBCDD815

## <u>AMENDMENT NO. 8 TO SUPPLY AGREEMENT</u>

This is Amendment No. 8 to Supply Agreement ("Amendment") and amends that certain Supply Agreement, effective March 1, 2017, as amended to date ("Existing Agreement"), by and between Sonova USA Inc. as successor in interest to Phonak, LLC and Unitron Hearing, Inc. ("Sonova USA" or "Supplier") and Fuel Medical Group, LLC ("Fuel Medical"). Sonova USA and Fuel Medical are referred to collectively herein as "the Parties." This Amendment is effective as of September 7, 2022 ("Effective Date").

WHEREAS, the Existing Agreement has been amended to extend the Term through September 7, 2022; and

WHEREAS, the Parties hereto desire to amend the Existing Agreement to further extend the Term through September 15, 2022, but otherwise leave the Existing Agreement intact.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## AMENDMENT TERMS

1. **Extension of Term**.  The Parties agree to further extend the Term (including the Initial Term and each Renewal Term) of the Existing Agreement through September 15, 2022.

2. **Definitions**. Capitalized terms used and not defined in this Amendment have the respective meanings assigned to them in the Existing Agreement.

3. **Date of Effectiveness; Limited Effect**. This Amendment is effective as of the Effective Date. Except as expressly provided in this Amendment, all of the terms and provisions of the Existing Agreement are and will remain in full force and effect and are hereby ratified and confirmed by the parties.

## [SIGNATURES ON NEXT PAGE]

IN WITNESS WHEREOF, the parties hereto knowingly and voluntarily executed this Amendment as of the Effective Date:

**Fuel Medical Group, LLC**

Signature: _Shawn Parker_
1DC5F4C9CC364FA...

Printed Name: Shawn Parker

Title: Founder

Date: 9/7/2022

**Sonova USA Inc.**

Signature: _Jason Mayer_
89565DB257B84EE...

Printed Name: Jason Mayer

Title: VP Sales

Date: 9/8/2022

**Fuel Medical Group, LLC**

Signature: _Brendan Ford_
2FDT34EA0FB24DE...

Printed Name: Brendan Ford

Title: Founder

Date: 9/7/2022

**Sonova USA Inc.**

Signature: _Daniel Lantry_
197167TC92DB461...

Printed Name: Daniel Lantry

Title: VP, Legal Affairs, North America

Date: 9/7/2022

# EXHIBIT F

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SONOVA USA INC., | |
| Plaintiff, | Case No. 1:22-cv-7055 |
| v. | |
| FUEL MEDICAL GROUP, LLC, | Formerly Case No. 2022MR000671 |
| | Circuit Court of DuPage County, Illinois |
| Defendant. | |

## NOTICE OF REMOVAL TO THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS

**TO THE CLERK OF THE COURT:**

**PLEASE TAKE NOTICE** that Defendant Fuel Medical Group, LLC ("Fuel Medical"), by its attorneys, hereby removes to this Court the state court action described below.

1.      On November 14, 2022, Plaintiff Sonova USA, Inc. ("Sonova") filed *Sonova USA Inc., v. Fuel Medical Group, LLC*, in the Circuit Court of DuPage County, Illinois.  (*See* Exhibit A, Declaration of Anna Sortun ("Sortun Dec.") ¶ 2, Ex. 1.)

2.      Sonova filed its Complaint in response to a demand letter and draft complaint that Fuel Medical sent to Sonova on October 20, 2022, which asserted the following claims for relief: (1) Breach of Contract – Notice (Supply Agreement), (2) Breach of the Implied Covenant of Good Faith and Fair Dealing, (3) Fraud, (4) Breach of Contract – Confidentiality (Supply Agreement), (5) Breach of Contract (Non-Disclosure Agreement), (6) Trade Secret Misappropriation, and (7) Promissory Estoppel.  (Sortun Dec. ¶ 3.)

3.      Sonova's Complaint seeks a declaratory judgment that Sonova did not engage in the conduct alleged by Fuel Medical in its demand letter and draft complaint.

4.      Counsel for Fuel Medical accepted service of Sonova's Complaint on November 28, 2022.  (Sortun Dec. ¶ 4.)

## JURISDICTION

5.      This Notice of Removal complies with the requirements of 28 U.S.C. § 1446(b).

6.      This is a civil action for which this Court has original jurisdiction under 28 U.S.C. § 1332.  It may be removed to this Court by Defendant pursuant to the provisions of 28 U.S.C. § 1446(b) and 1332 because it is a civil action with citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

### A.     Complete Diversity of Citizenship Exists

7.      Complete diversity of citizenship exists in this case.

8.      "Sonova is a Minnesota corporation with its principal place of business located in Aurora, Illinois."  (Sortun Dec. ¶ 2, Ex. 1 at 3.)  For purposes of diversity jurisdiction, the citizenship of a corporation is determined by its place of incorporation and its principal place of business.  *See* 28 U.S.C. § 1332(c).  Sonova is thus a citizen of both Minnesota and Illinois.

9.      "Fuel [Medical] is a Washington limited liability company, with its principal place of business in Camas, Washington."  (Sortun Dec. ¶ 2, Ex. 1 at 3.)  For purposes of diversity jurisdiction, the citizenship of a limited liability company is determined by the citizenship of the company's members.  *See Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.*, 374 F.3d 1020, 1022 (11th Cir. 2004).  No individual member of Fuel Medical resides in Minnesota or Illinois, and no corporate member of Fuel Medical is organized or has its principal place of business in Minnesota or Illinois (Sortun Dec. ¶ 5); therefore, complete diversity exists between the parties and the case is properly removed to federal court.

### B.     The Amount in Controversy Exceeds $75,000

10.     Through its Complaint for a declaratory judgment, Sonova is seeking relief from Fuel Medical's aforementioned alleged claims, which carry at least the following damage amounts:

| No. | Claim for Relief | Damages |
|-----|------------------|---------|
| 1 | Breach of Contract – Notice (Supply Agreement) | $14.7 million |
| 2 | Breach of the Implied Covenant of Good Faith and Fair Dealing | $14.7 million |
| 3 | Fraud | $14.7 million + punitives |
| 4 | Breach of Contract – Confidentiality (Supply Agreement) | $14.7 million + unjust enrichment |
| 5 | Breach of Contract (Non-Disclosure Agreement) | $2.4 million + unjust enrichment |
| 6 | Trade Secret Misappropriation | $14.7 million + unjust enrichment |
| 7 | Promissory Estoppel | $119.2 million |

(Sortun Dec. ¶ 3.)

11.     Because the amount in controversy in this dispute exceeds $75,000, federal court jurisdiction is proper.

**C.      Written Notice of Removal**

12.     Pursuant to 28 U.S.C. § 1446(d), Fuel Medical has provided written notice of removal to Sonova, is concurrently serving Sonova with a copy of this Notice of Removal, and will file a copy of the written Notice of Removal with the Clerk of the Court of DuPage County.

13.     By this Notice of Removal, Fuel Medical does not waive any objections it has as to service, jurisdiction or venue, or any other defenses or objections.  Fuel Medical expressly reserves all defenses, motions, and pleadings.

**WHEREFORE**, for the reasons articulated above, Fuel Medical notices the removal of this case to the United States District Court for the Northern District of Illinois, pursuant to 28 U.S.C. § 1441 *et seq.* and in conformity with the requirements set forth in 28 U.S.C. § 1446.

DATED: December 14, 2022                    Respectfully Submitted,

                                                            **FUEL MEDICAL GROUP, LLC,**

                                                            Defendant.


                                                            By:  _/s/  Hal J. Wood_____
                                                                    One of Its Attorneys

Hal J. Wood (IL# 6217069)
Nikita J. Desai (IL# 6340827)
**HORWOOD MARCUS & BERK CHTD**
500 West Madison Street, Suite 3700
Chicago, Illinois 60661
hwood@hmblaw.com
ndesai@hmblaw.com
312-606-3200

- and -

Anna Sortun (OR#045279)
Stephanie Grant (OR#154957)
**TONKON TORP LLP**
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
anna.sortun@tonkon.com
stephanie.grant@tonkon.com
503-802-2107
(*pro hac vice* application to be submitted)

*Counsel for Defendant.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney of record certifies that he caused a true and correct copy of the foregoing, **NOTICE OF REMOVAL TO THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS**, to be filed electronically in the United States District Court, for the Northern District of Illinois on December 14, 2022.  Notice and a copy of this filing will be served upon all counsel of record by email and U.S. first-class mail with postage prepaid, addressed as follows:

Ian H. Fisher
Paul J. Coogan
**TAFT STETTINIUS & HOLLISTER LLP**
111 East Wacker Drive, Suite 2800
Chicago, Illinois 60601
ifisher@taftlaw.com
pcoogan@taftlaw.com

By:   /s/  Hal J. Wood

# EXHIBIT G

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF NextGen 1.6.3**
**Eastern Division**

Sonova USA Inc.

 Plaintiff,

v.                                                  Case No.: 1:22–cv–07055
                                                    Honorable Mary M. Rowland

Fuel Medical Group, LLC

 Defendant.

---

**NOTIFICATION OF DOCKET ENTRY**

This docket entry was made by the Clerk on Thursday, December 15, 2022:

 MINUTE entry before the Honorable Mary M. Rowland: In light of Defendant's invocation of diversity as the basis for federal jurisdiction [1], on or before 1/15/23, Defendant shall file a jurisdictional supplement, as a separate docket entry. As Defendant correctly notes, an LLC's citizenship is determined by the citizenship(s) of its members. But allegations of negative citizenship or citizenship of "another state different from the Plaintiff" are insufficient in the Seventh Circuit. See Dalton v. Teva N. Am., 891 F.3d 687, 690 (7th Cir. 2018). Instead, Defendant must "identify the citizenship of each of [the LLC defendants'] members as of the date the complaint... was filed, and, if those members have members, the citizenship of those members as well." Thomas v. Guardsmark, LLC, 487 F.3d 531, 534 (7th Cir. 2007); see also West v. Louisville Gas & Elec. Co., 951 F.3d 827, 829 (7th Cir. 2020) (instructing that "there's no such thing as a [state name here] partnership or LLC, that only the partners' or members' citizenships matter, and that their identities and citizenships must be revealed"). Failure to file the jurisdictional supplement as directed may result in the remand of this case for lack of jurisdiction. Mailed notice. (dm, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.

# EXHIBIT H

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

SONOVA USA INC.,

               Plaintiff,

    v.

FUEL MEDICAL GROUP, LLC,

               Defendant.

Case No.  1:22-cv-7055
Formerly Case No. 2022MR000671
Circuit Court of DuPage County, Illinois

**DEFENDANT'S JURISDICTIONAL SUPPLEMENT**

On December 15, 2022, this court issued a Minute Order requesting that Defendant file a jurisdictional supplement on or before January 15, 2023, in which Defendant was to "identify the citizenship of each of [the LLC defendant's] members as of the date the complaint... was filed, and, if those members have members, the citizenship of those members as well."  Docket No. 5. In response to the court's order, Defendant states as follows:  Fuel Medical Group, LLC had three members.  The two majority members are individuals residing in Washington State.  The third member, which has only a minority interest in Fuel Medical Group, LLC, is a California corporation with its principal place of business in New Jersey.[1]

Dated this 13th day of January, 2023.

           Respectfully Submitted,

           **FUEL MEDICAL GROUP, LLC,**

           Defendant.

           By:  /s/  Hal J. Wood
                    One of Its Attorneys

---

[1] If Defendant has misunderstood the required content or form for this jurisdictional supplement, as set forth in the Court's December 15, 2022, order, Defendant requests leave to comply with any additional requirements.

043254\00002\14268659v4
6623084/2/22035.000

Hal J. Wood (IL# 6217069)
Nikita J. Desai (IL# 6340827)
**HORWOOD MARCUS & BERK CHTD**
500 West Madison Street, Suite 3700
Chicago, Illinois 60661
hwood@hmblaw.com
ndesai@hmblaw.com
312-606-3200

- and -

Anna Sortun (OR#045279)
Christopher Pallanch (OR#075864)
Stephanie Grant (OR#154957)
**TONKON TORP LLP**
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
anna.sortun@tonkon.com
christopher.pallanch@tonkon.com
stephanie.grant@tonkon.com
503-802-2107
(*pro hac vice* applications to be submitted)

*Counsel for Defendant.*

043254\00002\14268659v4
6623084/2/22035.000

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney of record certifies that he caused a true and correct copy of the foregoing, **DEFENDANT'S JURISDICTIONAL SUPPLEMENT**, to be filed electronically in the United States District Court, for the Northern District of Illinois on January 13, 2023.  Notice and a copy of this filing will be served upon all counsel of record by operation of the Court's CM/ECF electronic filing system.

By:    /s/  Hal J. Wood            

# EXHIBIT I

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

SONOVA USA INC.,

                  Plaintiff,

     v.

FUEL MEDICAL GROUP, LLC,

                  Defendant.

Case No. 1:22-cv-7055
Formerly Case No. 2022MR000671
Circuit Court of DuPage County, Illinois

### DEFENDANT'S AMENDED JURISDICTIONAL SUPPLEMENT

On December 15, 2022, this court issued a Minute Order requesting that Defendant file a jurisdictional supplement on or before January 15, 2023, in which Defendant was to "identify the citizenship of each of [the LLC defendant's] members as of the date the complaint... was filed, and, if those members have members, the citizenship of those members as well." Docket No. 5. On January 13, 2023, Defendant filed its Jurisdictional Supplement. Docket No. 10. On January 17, 2023, Plaintiff filed an untimely Motion to Remand styled as a Response in Opposition to Defendant's Motion to Transfer and Motion for Remand, objecting to the content of Defendant's Jurisdictional Supplement. Docket No. 14.[1]

In response to the court's order, and Plaintiff's objection, Defendant states as follows: As of the date the complaint was filed and continuing to today, Fuel Medical Group, LLC has three members. The two majority members, Brendan Ford and Shawn Parker, are citizens of Washington State. One minority member, Oticon Inc., is a citizen of California (its state of incorporation), and New Jersey (its principal place of business).

---

[1] Fuel is submitting a brief responding to Sonova's Motion to Remand and Response in Opposition to Motion to Transfer together with this supplement.

Dated this 20th day of January, 2023.

Respectfully Submitted,

**FUEL MEDICAL GROUP, LLC,**

Defendant.

By:  /s/  Hal J. Wood

One of Its Attorneys

Hal J. Wood (IL# 6217069)
Nikita J. Desai (IL# 6340827)
**HORWOOD MARCUS & BERK CHTD**
500 West Madison Street, Suite 3700
Chicago, Illinois 60661
hwood@hmblaw.com
ndesai@hmblaw.com
312-606-3200

- and -

Anna Sortun (OR#045279)
Christopher Pallanch (OR#075864)
Stephanie Grant (OR#154957)
**TONKON TORP LLP**
888 SW Fifth Avenue, Suite 1600
Portland, Oregon 97204
anna.sortun@tonkon.com
christopher.pallanch@tonkon.com
stephanie.grant@tonkon.com
503-802-2107
(*pro hac vice* applications to be submitted)

*Counsel for Defendant.*

043254\00002\14268659v4
6629874/2/22035.000

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned attorney of record certifies that he caused a true and correct copy of the foregoing, **DEFENDANT'S JURISDICTIONAL SUPPLEMENT**, to be filed electronically in the United States District Court, for the Northern District of Illinois on January 20, 2023.  Notice and a copy of this filing will be served upon all counsel of record by operation of the Court's CM/ECF electronic filing system.

By:   /s/  Hal J. Wood

# EXHIBIT J

1   strategies in the areas of marketing, professional development, information
2   technologies, human resources, and web services that improve overall patient
3   satisfaction, operational efficiencies, and staff retention, making life better for
4   patients, physicians, and staff alike.

5        2.    Sonova is a manufacturer of hearing instruments that it sells to
6   physicians, private practice audiology businesses, and hearing instrument
7   dispensing businesses.  Sonova USA's parent company, Sonova Holding, is a Swiss
8   entity.  To further its goal of more deeply penetrating the American market, Sonova
9   (and its predecessors Phonak, LLC ("Phonak") and Unitron Hearing, Inc.
10   ("Unitron")) engaged Fuel Medical to help sell certain Sonova products.  After a
11   more than decade-long relationship, however, Sonova surreptitiously made plans to
12   take Fuel Medical's customers and pricing information and to cut Fuel Medical out
13   of the relationship.  In furtherance of its plot to eliminate Fuel Medical, Sonova hid
14   material information from Fuel Medical and made material misrepresentations of
15   fact, eventually breaching its supply agreement with Fuel Medical.  By way of
16   example and not limitation, Sonova worked behind the scenes to build internal
17   programs to first steal, and then cater directly to, Fuel Medical's network (using
18   Fuel Medical's own proprietary pricing system to do so), all the while telling Fuel
19   Medical that it (Sonova) intended to continue working with Fuel Medical and
20   assuring Fuel Medical of its good intentions.  Sonova's actions have caused Fuel
21   Medical harm, as explained further below.

22                         **THE PARTIES**
23        3.    Plaintiff Fuel Medical is a Washington company authorized to do
24   business in the State of Washington, with its principal place of business in the State
25
26

COMPLAINT              -2-
Case No.

of Washington.  None of Fuel Medical's members is a citizen of Illinois, Minnesota, or Switzerland.

4.   Defendant Sonova USA is a Minnesota corporation with its principal place of business in Aurora, Illinois.

5.   Defendant Sonova Holding is a Swiss company with its principal place of business in Stäfa, Switzerland.

## JURISDICTION AND VENUE

6.   The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.  Fuel Medical is a Washington company with its principal place of business in Camas, Washington.  Sonova USA is a Minnesota corporation with its principal place of business in Aurora, Illinois.  Sonova Holding is a Swiss company with its principal place of business in Stäfa, Switzerland.  The amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

7.   Venue lies in this district pursuant to 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the events or omissions giving rise to Plaintiff's claims occurred.  Additionally, Sonova USA consented to the exclusive venue and jurisdiction of this Court pursuant to the terms of the Parties' 2017 Supply Agreement, explained in more detail below.

8.   This Court has specific personal jurisdiction over defendant Sonova USA because Sonova USA consented to such jurisdiction in its 2017 Supply Agreement with Fuel Medical, and because Sonova USA has purposefully availed itself of the privilege of doing business in Washington by, among other things, doing business with Fuel Medical.

9.   This Court has specific personal jurisdiction over defendant Sonova Holdings because Sonova Holdings has purposefully availed itself of the privilege of

COMPLAINT
Case No.

-3-

TONKON TORP LLP
888 SW Fifth Ave., Suite 1600
Portland, OR 97204
503.221.1440